## No. 26688
## No. 26690

**The People of the State of Colorado v. Charles Daniel Salazar, Jr., James Edward Wallace and Patrick Rodney Martinez**

(541 P.2d 676)

Decided October 20, 1975.

J. E. Losavio, Jr., District Attorney, David E. Ware, Deputy, Charles Malouff, Deputy, for plaintiff-appellant.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, R. D. Jorgensen, Deputy, Thomas M. Van Cleave, III, Deputy, for defendant-appellee Charles Daniel Salazar, Jr.

Darol C. Biddle, for defendant-appellee James Edward Wallace.

Carl W. Gellenthien, for defendant-appellee Patrick Rodney Martinez.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

This is an interlocutory appeal from rulings adverse to the district attorney on various motions filed by the appellees-defendants to suppress evidence, statements and grand jury testimony.

The motions arose out of two criminal actions in the district court of Pueblo County. The first case, No. 73381, by an amended three-count indictment, charged all three of the defendants in the first count with murder in the first degree, and in the second and third counts charged defendant Martinez with aggravated robbery and conspiracy to commit aggravated robbery. The second case, No. 74592, by direct information, charged defendants Salazar and Wallace with one count of aggravated robbery and a second count of conspiracy to commit aggravated robbery.

As a result of these charges, various motions and amended motions were filed, to quash the indictment, for bills of particulars, for discovery, to suppress evidence, to suppress grand jury testimony, to sever trials, to dismiss, and to consolidate the cases. An evidentiary hearing, lasting five and one-half full days, was conducted by the court in case No. 73381. A stiuplation was thereafter entered by defense counsel and the district attorney that the evidence presented in the hearing in No. 73381 would be applicable to the motions filed in No. 74592 and would be in lieu of any

further evidence or testimony in No. 74592. The various matters were taken under advisement and the court thereafter entered extensive findings of fact, conclusions of law, and orders granting or denying all of the various pending motions except as to defendant Wallace. As to Wallace, in case No. 73381, the court granted his motion to dismiss the amended indictment. No rulings were made as to the remaining Wallace motions in that case. In case No. 74592, Wallace's motion to suppress statements to the police and prosecution officials, and his grand jury testimony, was granted.

As a result of the various rulings on the motions and amended motions to suppress evidence, statements and grand jury testimony, the district attorney initiated an interlocutory appeal in each of the criminal actions. Upon motion here by the district attorney, the interlocutory appeals from the rulings in cases Nos. 73381 and 74592 were consolidated for review and decision.

We affirm the rulings of the trial court suppressing the evidence, statements and grand jury testimony.

Both criminal actions arose out of the following circumstances, as found by the trial court. A robbery of a 7-Eleven store in Pueblo was attempted early on the morning of December 29, 1973. The record shows that one Bernard Meehan entered the store at about 1:30 a.m. and held up those inside at gunpoint. At that time, Officer Thomas Martin Hanson of the Pueblo police department entered the store, unaware of the robbery in progress. Meehan shot and killed Hanson, and was in turn shot by Hanson's partner, who had been outside the store in a patrol car. Meehan later died as a result of his injuries.

The police, believing that Meehan might have had accomplices involved in the robbery, immediately began an intensive investigation. They found that Meehan had been seen earlier in the evening at a local tavern in the company of several people, including the three defendants in this case. At the time of the events here described, defendants Salazar and Wallace were seventeen and fifteen years of age, respectively.

## SALAZAR'S INVOLVEMENT

Later in the early morning of the 29th, Meehan's truck, which he had been driving the night before, was found parked in the street across town from Meehan's residence and within half a block of defendant Salazar's home. At about 7 a.m., Officers Hurley, Lutes and Concilja went to Salazar's home to question Salazar about the Meehan truck. The officers were admitted by Salazar's mother. Officer Hurley thereupon questioned Salazar about the events of the previous evening. Salazar admitted being with Meehan and defendant Martinez at the Warehouse Tavern during the previous evening, but he stated that he and Martinez had left Meehan's company and walked home. He denied driving Meehan's truck.

Doubting this story, the officers asked Salazar and his mother to go to the police station, where they were taken in separate police cars. Once they arrived, Officer Hurley explained that there had been an armed rob-

bery and two killings. Salazar denied being involved. Officer Hurley suggested that Salazar take a polygraph test to determine the truth. Salazar reluctantly agreed and was then advised of his *Miranda* rights. A juvenile advisement form was then presented to Salazar and was signed by him and his mother.

Salazar made it clear to Officer Hurley that he wished to have an attorney present during any interview and that he did not wish to make any statements. Salazar's mother also told Hurley that she did not wish her son to make any statements. Several attempts were made by Officers Hurley and Lutes to reach members of the Public Defender's staff by telephone but without success.

At approximately 8 a.m., Elias Manzanares, a first cousin of Salazar, and a member of the Pueblo police department, spoke with Salazar's mother and told her that he was a suspect in the Hanson murder and that if her son was involved or if he knew anybody that was involved it would be better for him to speak up. He told Salazar to speak up and tell what he knew. In the court's words, Manzanares, who was in uniform when he talked to Salazar and Salazar's mother, ". . . said he was speaking to them as a relative, a friend and a police officer." Then, at about 8:30 a.m., two FBI agents appeared to talk with Salazar. They were interested in both the homicide and in defendant Martinez, who was AWOL from the Marine Corps. One of the agents asked Salazar if he had been asked to take a polygraph test and, after being advised that he had, in the words of the court, "The agent informed Salazar that if he passed the polygraph test, they may let you go home; or if you clear it up — if everything you say comes out true, they will have no way to hold you." Salazar then indicated he was ready to take the polygraph test.

Officer Arriaga was called to administer the polygraph test. A form of written request to take the polygraph test and release was presented to Salazar for his signature. The court found that

"Neither Salazar nor his mother had withdrawn the request for an attorney during any interview or their desire that Salazar make no statement. Salazar was not advised, nor was his mother, by either Officer Arriaga or Officer Hurley that an attorney could be present during the pre-test interview and polygraph interview, nor was Salazar advised that any statements made to Officer Arriaga during the interview could be used against him. Officer Arriaga did advise Salazar that the results of the polygraph examination would be made available to the Police Department or to the District Attorney's office. Salazar's mother was not allowed to enter or be present during the interviews with her son. Salazar made inculpatory statements to Officer Arriaga during the course of the pre-test interview and also during the polygraph interview. Officer Arriaga then advised Officer Hurley that Salazar was willing to tell him what he wanted to know about the armed robbery of the 7-Eleven store and the murder of Officer Hanson.

"* * * Officer Hurley again advised Salazar of his *Miranda* rights in the presence of his mother and they both signed another juvenile advisement form (People's Exhibit 12). Salazar was re-advised by Officer Hurley because he was about to repeat the incriminating statements made to Officer Arriaga and Officer Hurley wanted an indication from Salazar that he had changed his mind about wanting an attorney present and making a statement."

During this period of time, while Salazar was in custody, an attorney was present at the police station to see two of his clients who had been arrested because of the death of Officer Hanson. He was made aware that two individuals had been arrested in connection with Hanson's death and that the police were having difficulty getting an attorney to represent a suspect who was a juvenile [Salazar]. The attorney offered his services to the police officers for the purpose of advising the juvenile suspect. He was told his services were not needed.

## WALLACE'S INVOLVEMENT

The record showed that while the officers were trying to locate defendant Martinez they discovered Wallace in the home of a girl friend. Wallace was identified by Officer Snell as an escapee from the Lookout Mountain School for Boys. He was immediately taken into custody and confined in the city jail. Later, Salazar was placed in the same jail cell. Thereafter, Wallace was questioned by officers concerning his jail conversations with Salazar about the armed robbery of the 7-Eleven store. No *Miranda* warnings were given Wallace. His parents were not there, nor was any attorney present representing him at the time of this interrogation. A written statement was obtained from Wallace which placed him, Martinez and Salazar together at the Warehouse Tavern and the Brass Rail Bar the night of the robbery. The statement also contained incriminating statements made by Salazar to Wallace.

Wallace was thereafter transferred to the Pueblo county jail. In the afternoon of January 3, 1974, Wallace was again questioned by an officer and also by a deputy district attorney. No *Miranda* warnings were given him at this time; his parents were not present; nor was he afforded an attorney. At about 3 p.m. he was served with a subpoena to appear before the grand jury that evening. He appeared without his parents and without an attorney. He was not advised of his Fifth Amendment privilege against self-incrimination before being questioned. The record suggests that Wallace attempted to repudiate some of his earlier statements and that he was accused by the district attorney of lying.

As a result of that grand jury investigation, an indictment was returned, accusing Salazar of murder.

During the period of time between January 3 and January 17, Wallace, while in custody in the Pueblo county jail, made inculpatory statements to the other inmates of the jail. These statements incriminated both Martinez and Salazar. Thereafter, the grand jury reconvened on January 17 and returned its amended indictment on January 18, charging all three

defendants with murder, and charging Martinez in separate counts with aggravated robbery and conspiracy to commit aggravated robbery.

The court found that from the time of Wallace's arrest on December 29, 1973, until after his indictment on January 18, 1974, Wallace had never been taken before a judicial officer and advised of his rights pursuant to Crim. P. 5(a) or section 19-2-103(2), C.R.S. 1973.

## MARTINEZ' INVOLVEMENT

Defendant Martinez learned that the police were looking for him in connection with the 7-Eleven robbery, and he voluntarily surrendered on the evening of December 29. He was advised of his *Miranda* rights in the presence of his mother and stepfather. He then waived his right to remain silent and made a statement in which he denied any complicity in the crime. Martinez then agreed to a polygraph test and he was again advised of his rights. The polygraph test showed that he was being evasive. Martinez was then booked as being an AWOL Marine and detained for federal authorities in the county jail.

During the course of the next day, December 30th, Martinez was again twice advised of his *Miranda* rights. After considerable questioning, he eventually gave a statement which was taped, reduced to writing, and signed by him at 2:25 a.m. on December 31st. He was thereafter taken before the Pueblo county court and advised that he was being held on charges of first-degree murder, aggravated robbery, and conspiracy to commit aggravated robbery. He was then ordered confined without bail.

On January 1, 1974, he was requested to take another polygraph test, which he refused. He stated he did not want to talk any more unless he had an attorney.

On January 3, he was interrogated again, after advisement. He was then subpoenaed to appear before the grand jury that evening. At his appearance before the grand jury, he was not advised of his privilege against self-incrimination, presumably because the district attorney believed he was not yet a viable suspect in the case. He testified before the grand jury and repeated his earlier story. Thereafter, on January 28, Martinez was indicted along with Salazar and Wallace.

## THE COURT'S CONCLUSIONS AND RULINGS

■ The record of evidence fully supports the foregoing findings, and we are not free to substitute our conclusions for those of the trial court. *People v. Medina*, 180 Colo. 56, 501 P.2d 1332.

## I - SALAZAR

■ The court granted Salazar's three motions to suppress the statements made while in police custody. The court concluded, among other reasons, that the statements were involuntary and taken in violation of Salazar's constitutional rights, in that both Salazar and his mother, orally and in writing, expressed their desire that he exercise his right to remain silent and to consult with an attorney before giving any statements. The court found that neither the mother nor Salazar had effectively waived these rights prior to his interrogation which resulted in the inculpa-

tory statements. We agree.

There is evidence in the record to support the court's conclusion that Salazar's request for an attorney was never withdrawn prior to the first incriminating admission obtained from him by the polygraph examiner. Each statement thereafter given by him flowed from the taint of the first improperly obtained statement and was therefore suppressible. *People v. Pineda*, 182 Colo. 385, 513 P.2d 452. Although the officers made initial efforts to call members of the Public Defender's staff, they did not discontinue interrogation until an attorney could be secured. Ironically, at the very time the request for counsel was made, there was an attorney available in the police building, who had offered his services in this regard, which were rejected by the police, who were well aware of Salazar's request for counsel. *Cf. Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

Under the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, when the request for counsel had been made, it was incumbent on the police to cease interrogation until request for counsel had been complied with or had been effectively withdrawn. The persistent questioning by the police, the prosecution-oriented advice by the FBI agents to take the polygraph test, together with the influence exerted by Salazar's trusted relative, his policeman cousin, Manzanares, vitiated any subsequent waiver of his *Miranda* rights, as the trial court properly concluded. *People v. Pineda, supra; People v. Medina, supra.*

As an additional reason for the suppression order, the trial court found a clear violation of the Children's Code, section 19-2-102(3)(c)(I), C.R.S. 1973, which provides:

"No statements or admissions of a child made as a result of interrogation of the child by a law enforcement official concerning acts alleged to have been committed by the child which would constitute a crime if committed by an adult shall be admissible in evidence against that child unless a parent, guardian, or legal custodian of the child was present at such interrogation and the child and his parent, guardian, or legal custodian were advised of the child's right to remain silent, that any statements made may be used against him in a court of law, the right of the presence of an attorney during such interrogation, and the right to have counsel appointed if so requested at the time of the interrogation; except that, if a public defender or counsel representing the child is present at such interrogation, such statements or admissions may be admissible in evidence even though the child's parent, guardian, or legal custodian was not present."

Salazar's mother was not admitted into the room where the polygraph pretesting interview was held, nor was she admitted during the polygraph examination, and, of course, no counsel was present during these procedures. *People In Interest of L.B.*, 33 Colo. App. 1, 513 P.2d 1069. We affirm the court's order of suppression of the inculpatory statements made by Salazar while in police custody.

## II - WALLACE

In Case No. 74592, the court granted Wallace's motions to suppress the statements made to the police and to the prosecution officials, and to suppress all grand jury testimony. The court concluded the statements were involuntary and were obtained in violation of his constitutional and statutory rights. The court found that Wallace was never taken before a judicial officer as required by Crim. P. 5(a), nor was he advised of his rights pursuant to section 19-2-102(3)(c)(I), C.R.S. 1973. The court found, however, that the statements made by Wallace to his fellow jail inmates were voluntary and not the result of actions by the police or by the prosecution. The court therefore denied the motion to suppress those statements.

As to Wallace's testimony before the grand jury, the court concluded that Wallace was a putative or focused-on defendant, though not yet charged, when he was involuntarily taken before the grand jury on January 3, 1974. At no time was he advised of his privilege against self-incrimination, and, therefore, his testimony should be suppressed. These findings are supported by competent evidence. Significantly, one officer testified that he considered Wallace a suspect prior to the grand jury session; and, further, there was discussion among the district attorney's staff prior to the grand jury session concerning possible indictment of Wallace, although it was then concluded that there was insufficient evidence at that time to proceed.

As a putative or focused-on defendant, though not yet charged, Wallace was entitled to advisement of his constitutional privilege against self-incrimination before being compelled to testify before the grand jury. *People v. Spencer*, 182 Colo. 189, 512 P.2d 260. *People v. Clifford*, 105 Colo. 316, 98 P.2d 272. The grand jury testimony of Wallace was therefore properly suppressed.

## III - MARTINEZ

The court granted the motion of Martinez to suppress his grand jury testimony, but denied the motion as it related to statements made to law enforcement officers prior to the grand jury session of January 3, 1974. Clearly, the statements given to the officers were voluntary after several full and complete *Miranda* advisements, and they were therefore not subject to suppression. On the other hand, when Martinez was subpoenaed to testify before the grand jury, the evidence clearly established without dispute that he was a putative focused-on suspect, even though uncharged. He had been advised by the county court that he was being held on murder, robbery, and conspiracy charges.

It was therefore incumbent that he be specifically advised of his Fifth Amendment privilege against self-incrimination before being compelled to testify before the grand jury. *People v. Spencer, supra.* The suppression of his grand jury testimony was properly ordered by the trial court.

Accordingly, the suppression rulings of the district court are affirmed.

MR. CHIEF JUSTICE PRINGLE does not participate.