**STATE of Minnesota, Respondent,**

v.

**Jesse James CRISLER, Appellant.**

No. 48728.

Supreme Court of Minnesota.

Nov. 9, 1979.

Rehearing Denied Dec. 11, 1979.

C. Paul Jones, Public Defender, Minneapolis, Barry Voss, Roseville, for appellant.

Warren Spannaus, Atty. Gen., Thomas W. Foley, County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Heard before ROGOSHESKE, TODD, and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendant, Jesse J. Crisler, was found guilty by a district court jury of second-degree murder[1] and sentenced to 0 to 40 years. On appeal he asserts that the evidence was insufficient to support the jury's verdict of guilty, that the jury was not properly instructed on the defense of accidental death, and that the trial court erred in admitting into evidence statements made by him to the police. We conclude that by interrogating defendant after he asked to call his attorney the police violated his fifth amendment rights. Because the interrogation evidence admitted at trial was not harmless beyond a reasonable doubt, we reverse and remand for a new trial.

In the early morning hours of August 15, 1977, a group of men, including defendant, were drinking and gambling in the basement of a residence located at 937 Marshall Avenue in St. Paul, Minnesota. A dispute over a bet arose between defendant and the eventual victim, Joe Merritt. Defendant denied that he owed Merritt any money and left the premises.

A short time later defendant returned, because, according to his testimony, he had decided to pay Merritt the money so he could begin gambling again. Defendant stated that as he approached the gambling table he saw Merritt reach for a gun. Three eyewitnesses to the incident, however, testified that Merritt did not have a gun. Defendant then drew his gun; as he did so, Calvin Morey attempted to prevent him from shooting the gun by hitting his hand. The impact caused the gun to discharge.

Whether this initial shot struck Merritt and what transpired after the first shot is uncertain. It is certain, however, that in the ensuing confusion at least two additional shots were fired from defendant's gun. Defendant admitted firing a second shot in the direction of Merritt but was not able to account for the third shot. After the final shot had been fired, Merritt eventually climbed the basement stairs into the backyard, where he collapsed with one wound in his buttock and another in the left center of the front of his chest. Merritt died from the massive internal bleeding caused by his chest wound.

1. Second-degree murder is defined in Minn. Stat. § 609.19 (1978): "Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of murder in the second degree * * *."

Defendant was arrested at the scene of the incident by Officer James Blakey, with whom he was previously acquainted. Officer Blakey testified that he advised defendant of his rights in the squad car and then drove him to the police station. Shortly after arriving at the station, defendant was questioned by another officer, Captain Verhulst. Before agreeing to speak to Captain Verhulst, defendant asked Officer Blakey if it was "all right to talk to the captain," and Officer Blakey said, "yes." Defendant then gave an account of the shooting to the officers. Although Officer Blakey testified that Captain Verhulst asked defendant whether he had been informed of his rights and defendant responded affirmatively, defendant stated that up to that time no one had advised him of his rights. Defendant also testified, however, that he may have forgotten.

A few hours later, at approximately 11 a.m. a St. Paul police sergeant interrogated defendant. He gave defendant full oral and written *Miranda* warnings, which defendant acknowledged orally and by signing the written modification-of-rights form. At a point during or just prior to his oral statement to the officer, defendant asked for and was given permission to telephone his attorney. When he was unable to reach him, defendant called a friend and asked the friend to tell defendant's attorney that defendant was in jail and wanted to see him. The officer nevertheless then proceeded to take defendant's statement, and his testimony regarding the statement was admitted at trial over defendant's objection.

The critical issue in this case is whether the trial court committed constitutional error in admitting, during the prosecution's case in chief, the testimony of the officer that defendant said in his pretrial statement that the victim had no gun.

The guidelines regarding custodial interrogation are well established:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.

*Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed. 694 (1966). *See State v. Innis,* R.I., 391 A.2d 1158 (1978), *cert. granted,* 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979).[2]

■■■ The essence of *Miranda* is that unless the prosecution establishes compliance with the procedural safeguards designed to protect fifth and sixth amendment rights, statements of the accused made during custodial interrogation are constitutionally inadmissible. Hence, when an accused has been given *Miranda* warnings, all express and implied commitments embodied in those warnings must be "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Surely, when an accused asserts his right to counsel, any further interrogation must cease in obedience to the clearly implied commitment that the accused will not be asked to answer further questions until he has consulted with his attorney or his attorney is present.

■■■ Adhering to the *Miranda* decision, we stated the rule applicable to this case: [D]efendant must not only be given the right to remain silent from the beginning of a custodial interrogation but also the right to become silent and to request counsel after some initial interrogation. * * * [D]efendant has the right to stop custodial interrogation at any time * * *.

2. *See generally* White, *Rhode Island v. Innis: The Significance of a Suspect's Assertion of*

*His Right to Counsel,* 17 Am.Crim.L.Rev. 53 (1979).

*State v. Roberts,* 296 Minn. 347, 352, 208 N.W.2d 744, 747 (1973). Even though the officer properly informed defendant of his rights, he did not honor defendant's right to stop the interrogation when he sought to contact his attorney. Since in this case the record is devoid of any evidence that defendant subsequently disavowed his request to speak to his attorney, we hold that the officer incorrectly continued the interrogation after defendant attempted to reach his attorney and that the subsequent questioning was improper and in violation of defendant's constitutional rights; as a result, the officer's testimony should not have been admitted into evidence.[3]

■ Given that it was error to admit the testimony, we must determine whether the error was prejudicial or merely harmless error. Before a federal constitutional error can be held harmless, the party benefiting from the error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Thus, if there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction, defendant has been prejudiced and must be granted a new trial. *See State v. Roberts, supra.*[4] Of course, not every constitutional error is prejudicial to the defendant. *Chapman v. California,* 386 U.S. at 22, 87 S.Ct. 824. We have recognized that where the evidence would have been admitted anyway, *State v. Simon,* 275 N.W.2d 51 (Minn.1979), or where the other evidence against the defendant overwhelmingly points to his guilt, any error is harmless beyond a reasonable doubt. *State v. Hull,* 269 N.W.2d 905, 909–10 (Minn.1978).

■ Applying the above standard, we find that the admission into evidence of the officer's testimony was prejudicial to defendant. Defendant asserted self defense at trial, testifying that he drew his gun because he saw Joe Merritt, the victim, reach for his gun. The officer testified, however, that defendant admitted during his interrogation that Merritt had no gun. Whether Merritt did have a gun is, of course, crucial to defendant's claim of self defense and his credibility was undoubtedly undermined by the officer's contrary trial testimony. Because the damages to defendant's credibility could have influenced the jury's finding that defendant's actions were not justified by self defense, we hold that the error in admitting the officer's testimony was sufficiently prejudicial to require that defendant be granted a new trial.

■ We also believe the trial court's instructions were deficient since they did not adequately explain the defense of accidental death. After instructing the jury on the elements of the crimes with which defendant was charged, the court instructed it on the law of self defense. During the course of this instruction, the trial court stated: "If Joe Merritt was accidentally killed in the lawful use of force, then, of course, the defendant would not be guilty of any homicide." This was the only specific reference to accidental death in the instructions. Counsel for defendant did not request a

---

3. The state argues that even if defendant's fifth amendment rights were violated by the officer's interrogation, the officer's testimony was admissible for purposes of impeaching defendant's trial testimony under the doctrine of *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). *See State v. Boykin,* 252 N.W.2d 604 (Minn.1977). In *Harris,* the defendant made statements which were conceded to be inadmissible on constitutional grounds. The prosecution used the statements in cross-examining defendant for impeachment purposes when he chose to testify. The Supreme Court approved this procedure, holding that a statement which is inadmissible on constitutional grounds during the prosecution's case in chief can be used for impeachment purposes if the defendant voluntarily takes the stand. 401 U.S. at 225, 91 S.Ct. 643. Unlike *Harris,* the officer's testimony in this case was not used solely for impeachment but was also admitted during the prosecution's case in chief.

4. In making this determination, the fact that defendant's conviction is supported by sufficient competent evidence, as it is in this case, is not decisive but is only a factor. *State v. Carlson,* 268 N.W.2d 553, 561 (Minn.1978).

specific instruction on the theory of accidental death nor did he object to the court's instructions as given. Notwithstanding defendant's failure to object to the instructions, we agree that the trial court's cursory reference to accidental death was inadequate and may have been misleading. While our reversal is not based on this deficiency, if the evidence on retrial is similar to that presented in the original trial, defendant is entitled to a more complete instruction on the effect of a finding that the shooting was accidental.

Reversed and remanded for a new trial.