SOLEM, WARDEN, SOUTH DAKOTA STATE
PENITENTIARY *v.* STUMES

No. 81–2149.   Argued November 28, 1983—Decided February 29, 1984

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 651. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 655.

*Mark V. Meierhenry*, Attorney General of South Dakota, argued the cause and filed briefs for petitioner.

*Timothy J. McGreevy*, by appointment of the Court, 464 U. S. 808, argued the cause and filed a brief for respondent.

JUSTICE WHITE delivered the opinion of the Court.

The question in this case is whether *Edwards* v. *Arizona*, 451 U. S. 477 (1981), should be applied retroactively.

I

Respondent, Norman Stumes, was a suspect in the death of Joyce Hoff in Sioux Falls, S. D. On September 27, 1973, Stumes was arrested in Green Bay, Wis., on pending perjury and felony check charges. He had not yet been charged with Hoff's death. The following morning he spoke by phone with his attorney in Sioux Falls, who told him not to make any statements before returning to South Dakota. Three Sioux Falls police officers, Skadsen, Green, and Hendrick, went to Green Bay to bring Stumes back. They first spoke with him on the morning of October 1. After being read his *Miranda* rights, Stumes said that he understood them and did not object to speaking with police without his attorney present. After an hour and a half of conversation about the homicide,

Green asked Stumes if he would be willing to take a lie detector test. Stumes answered that "that is a question I'd rather not answer until I talk to [my attorney]." At that point the officers stopped questioning.

The officers returned that afternoon and recommenced questioning without giving *Miranda* warnings. Stumes admitted he had been in Hoff's apartment the night of the killing and that they had had intercourse, but he denied having had anything to do with her death. When asked if the death had been intentional or accidental, Stumes said that it had been accidental. He then stated that "I would rather not talk about it any more at this time until I talk to my attorney, and after that I'll give you a full statement in regards to her death." Questioning thereupon ceased.

The next morning Stumes and the three officers set out, by car, on the 600-mile trip to Sioux Falls. Stumes was given his *Miranda* warnings at the beginning of the trip, and was asked whether he would be willing to talk. He shrugged and nodded affirmatively, and there was then some further questioning. For most of the trip, the conversation was about unrelated matters, though occasionally the subject of Hoff's death came up. Late in the afternoon, after a 10- or 15-minute silence in the car, respondent had what he referred to as "a little conflict with my emotions" and "made the statement that I couldn't understand why anybody would want to kill Joyce and that the taking of a human life is so useless." Green told him he would feel better if he "got it off his chest." Stumes then recounted striking and strangling Hoff after she had said she would tell someone that she and Stumes had slept together. Green asked if Stumes would give the police a statement when they reached Sioux Falls, noting that his attorney would undoubtedly advise him not to. Stumes agreed to give a statement, stating: "I don't give a damn what he says. I'm doing anything I feel like, and I'll talk to anybody I want to." Stumes and the officers reached Sioux Falls at about 6:45 in the evening. Shortly after being

placed in a cell, Stumes called for Skadsen, asking him to "tell them that I didn't mean to kill her, that it was an accident—that I'm not a vicious killer."

Stumes was charged with murder; the trial court refused to suppress any of his statements to the police; and the jury found him guilty of first-degree manslaughter and sentenced him to life imprisonment. On direct appeal, the State Supreme Court remanded for a determination whether Stumes' statements had been voluntary. The trial court found that they had; the conviction was accordingly "automatically affirmed." 90 S. D. 382, 241 N. W. 2d 587 (1976).

Stumes then filed this petition for a writ of habeas corpus in the United States District Court for the District of South Dakota. The District Court denied the writ after an evidentiary hearing. It concluded that Stumes had knowingly, intelligently, and voluntarily waived his right to counsel. *Miranda* did not require that all questioning must cease forever once a suspect has requested counsel. 511 F. Supp. 1312 (1981). Given the totality of the circumstances, the questioning during the trip to South Dakota was proper.[1]

While Stumes' appeal was pending, we held that once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him. *Edwards* v. *Arizona*, *supra*. Applying *Edwards* to this case, the Court of Appeals for the Eighth Circuit found that the police had acted unconstitutionally in twice renewing interrogation after Stumes had invoked his right to counsel. 671 F. 2d 1150 (1982).[2]

---

[1] The District Court found that the morning questioning was not unconstitutional. Stumes was informed of his rights and questioning ceased when he requested a lawyer. The court concluded that the afternoon session was unconstitutional because the officers had failed to reinform Stumes of his rights. However, it considered the trial court's error in admitting statements made at that time harmless beyond a reasonable doubt.

[2] The court thought that Stumes' agreement to speak when the police resumed questioning was not a valid waiver. Nor was his comment that taking a human life was useless the initiation of new conversation about the

Petitioner sought a writ of certiorari on three questions: whether the conduct of the police in this case violated *Edwards*, whether the District Court adequately deferred to the state court's factfinding, and whether *Edwards* should be applied retroactively. We granted certiorari only as to the third. 463 U. S. 1228 (1983). We therefore assume for present purposes that the conduct at issue here violated *Edwards*. We need not decide whether the police also violated *Miranda* v. *Arizona*, 384 U. S. 436 (1966), a question not considered by the Court of Appeals. Because we conclude that the court erred in applying *Edwards* to this case, we reverse and remand for reconsideration under pre-*Edwards* law.

## II

As a rule, judicial decisions apply "retroactively." *Robinson* v. *Neil*, 409 U. S. 505, 507–508 (1973). Indeed, a legal system based on precedent has a built-in presumption of retroactivity. Nonetheless, retroactive application is not compelled, constitutionally or otherwise. *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 364 (1932). Since *Linkletter* v. *Walker*, 381 U. S. 618 (1965), which held that *Mapp* v. *Ohio*, 367 U. S. 643 (1961), applied only to defendants whose convictions were not yet final when *Mapp* was decided, we have recognized that "the interest of justice" and "the exigencies of the situation" may argue against imposing a new constitutional decision retroactively. 381 U. S., at 628. The basic principles of retroactivity in criminal cases were established in *Linkletter* v. *Walker*,

---

homicide, particularly as it came only after he had been questioned intermittently throughout the trip and the actual incriminating statement was prompted by the officer's invitation to "get it off his chest." Finally, the statement to Skadsen at the jail was tainted by the previous, unconstitutionally obtained, incriminating statements. One judge dissented on the ground that Stumes had initiated further communication and made a valid waiver. The court did not consider whether *Edwards* should be applied retroactively.

*supra*, *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406 (1966), and *Johnson* v. *New Jersey*, 384 U. S. 719 (1966). Under these cases,

> "[t]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967).[3]

Examining *Edwards* in light of these three factors, we conclude that it should not be applied retroactively.

## A

Complete retroactive effect is most appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials. See *Williams* v. *United States*, 401 U. S. 646, 653, and n. 6 (1971) (plurality opinion) (citing cases). The *Edwards* rule has only a tangential relation to

---

[3] A majority of the Court has recently adopted a slightly different approach in the Fourth Amendment area. *United States* v. *Johnson*, 457 U. S. 537 (1982). Without considering the *Linkletter/Stovall* factors, *Johnson* held that a decision construing the Fourth Amendment that was not a "clear break with the past" is to be applied to all convictions not yet final when the decision was handed down. The Court was careful to note the limits to its holding:

"First, our decision today does not affect those cases that would be clearly controlled by our existing retroactivity precedents. Second, because respondent's case arises on direct review, we need not address the retroactive reach of our Fourth Amendment decisions to those cases that still may raise Fourth Amendment issues on collateral attack. Third, we express no view on the retroactive application of decisions construing any constitutional provision other than the Fourth Amendment." 457 U. S., at 562 (footnotes and citation omitted).

These limitations make *Johnson* inapplicable to this case, which is controlled by prior precedent, arises on collateral review, and does not involve the Fourth Amendment.

truthfinding at trial. As we have noted in the past, "the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree." *Johnson* v. *New Jersey, supra,* at 728–729. The application of the exclusionary rule pursuant to *Edwards* is perhaps not as entirely unrelated to the accuracy of the final result as it is in the Fourth Amendment context. See *United States* v. *Peltier,* 422 U. S. 531 (1975); *Desist* v. *United States,* 394 U. S. 244 (1969). Yet the *Edwards* rule cannot be said to be a *sine qua non* of fair and accurate interrogation. We faced a similar situation in *Stovall* v. *Denno, supra,* where we held that the newly established rule that counsel had to be present during lineups was not to be applied retroactively. There we noted that although excluding identifications made in the absence of counsel was "justified by the need to assure the integrity and reliability of our system of justice, [it] undoubtedly will affect cases in which no unfairness will be present." *Id.,* at 299. The same is true of the *Edwards* rule. The fact that a suspect has requested a lawyer does not mean that statements he makes in response to subsequent police questioning are likely to be inaccurate. Most important, in those situations where renewed interrogation raises significant doubt as to the voluntariness and reliability of the statement and, therefore, the accuracy of the outcome at trial, it is likely that suppression could be achieved without reliance on the prophylactic rule adopted in *Edwards.*[4]

We have frequently refused to give retroactive effect to decisions that bore at least as heavily on the truthfinding

---

[4] Like, for example, *Miranda* and *North Carolina* v. *Pearce,* 395 U. S. 711 (1969), *Edwards* did not confer a substantive constitutional right that had not existed before; it "created a protective umbrella serving to enhance a constitutional guarantee." See *Michigan* v. *Payne,* 412 U. S. 47, 54 (1973). Because the "foundational" right was, and remains, available to defendants in pre-*Edwards* cases, "a decision of nonretroactivity is less likely to result in the continued incarceration of those whose convictions . . . rest on unconstitutional acts." 412 U. S., at 54.

function. The most notable of these is *Miranda* itself, which was held to apply only to trials taking place after it was decided. *Johnson* v. *New Jersey, supra.*[5] See generally *Williams* v. *United States, supra,* at 655, n. 7. The *Edwards* rule is a far cry from the sort of decision that goes to the heart of the truthfinding function, which we have consistently held to be retroactive. *E. g., Brown* v. *Louisiana,* 447 U. S. 323 (1980); *Hankerson* v. *North Carolina,* 432 U. S. 233 (1977); *Arsenault* v. *Massachusetts,* 393 U. S. 5 (1968). Rather, it is a prophylactic rule, designed to implement preexisting rights. This Court has not applied such decisions retroactively. See *Michigan* v. *Payne,* 412 U. S. 47 (1973); *Halliday* v. *United States,* 394 U. S. 831 (1969) *(per curiam); Stovall* v. *Denno, supra.*

## B

In considering the reliance factor, this Court's cases have looked primarily to whether law enforcement authorities and

---

[5] Much of what was said in *Johnson* v. *New Jersey* applies equally to this case:

"[T]he prime purpose of *[Escobedo* and *Miranda]* is to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice. They are designed in part to assure that the person who responds to interrogation while in custody does so with intelligent understanding of his right to remain silent and of the consequences which may flow from relinquishing it. . . . [W]hile *Escobedo* and *Miranda* guard against the possibility of unreliable statements in every instance of in-custody interrogation, they encompass situations in which the danger is not necessarily as great as when the accused is subjected to overt and obvious coercion.

"At the same time, our case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. . . . Prisoners may invoke a substantive test of voluntariness. . . . Thus, while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim." 384 U. S., at 729–730.

See also *Jenkins* v. *Delaware,* 395 U. S. 213, 222 (1969).

state courts have justifiably relied on a prior rule of law said to be different from that announced by the decision whose retroactivity is at issue. Unjustified "reliance" is no bar to retroactivity. This inquiry is often phrased in terms of whether the new decision was foreshadowed by earlier cases or was a "clear break with the past."[6] When the Court has explicitly overruled past precedent, disapproved a practice it has sanctioned in prior cases, or overturned a longstanding practice approved by near-unanimous lower-court authority, the reliance and effect factors in themselves "have virtually compelled a finding of nonretroactivity." *United States* v. *Johnson*, 457 U. S. 537, 549–550 (1982). See also *id.*, at 551–552. We have been less inclined to limit the effect of a decision that has been "distinctly foreshadowed." *Brown* v. *Louisiana, supra,* at 336. At just what point of predictability local authorities should be expected to anticipate a future decision has been unclear, however.

*Edwards* established a bright-line rule to safeguard pre-existing rights, not a new substantive requirement. Before and after *Edwards* a suspect had a right to the presence of a lawyer, and could waive that right. *Edwards* established a new test for when that waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication. Prior to *Edwards* the

---

[6] It can be both. A decision that overrules much-criticized precedent may well have been clearly foreshadowed. *Katz* v. *United States*, 389 U. S. 347 (1967), was such a decision. In holding that it was not retrospective, we stated: "However clearly our holding in *Katz* may have been foreshadowed, it was a clear break with the past" because it expressly overruled prior decisions. *Desist* v. *United States*, 394 U. S. 244, 248 (1969). Indeed, the dissent insisted there was nothing new about *Katz*. "*Katz* is not responsible for killing *Olmstead*. Prior cases had left the physical-trespass requirement of *Olmstead* virtually lifeless and merely awaiting the death certificate that *Katz* gave it." 394 U. S., at 275 (Fortas, J., dissenting). Our cases indicate that even in this situation authorities are generally entitled to rely on existing case law, whatever its disrepute.

Court had "strongly indicated that additional safeguards are necessary when the accused asks for counsel," 451 U. S., at 484, and had several times referred to an accused's right to be free from further questioning once he invoked his right to counsel, see *id.*, at 485. *Edwards* did not overrule any prior decision or transform standard practice. Thus, it is not the sort of "clear break" case that is almost automatically nonretroactive.

*Edwards* nonetheless did establish a new rule. We do not think that the police can be faulted if they did not anticipate its *per se* approach. Cf. *Adams* v. *Illinois*, 405 U. S. 278, 283 (1972) (plurality opinion). Prior to *Edwards*, the emphasis in our cases had been on whether, as an individual, case-by-case matter, a waiver of the right to counsel had been knowing, voluntary, and intelligent. See *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). As we said in *North Carolina* v. *Butler*, 441 U. S. 369, 374–375 (1979), relying on *Johnson* v. *Zerbst* and treating the Fifth Amendment right to counsel as *a fortiori*, "[e]ven when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" There we saw "no reason to discard that standard and replace it with an inflexible *per se* rule." 441 U. S., at 375. See also *Fare* v. *Michael C.*, 442 U. S. 707, 724–725 (1979). The *Miranda* majority, 384 U. S., at 475, viewed the waiver question as controlled by *Johnson* v. *Zerbst* and was taken to task for that view by one of the dissenters, 384 U. S., at 513–514 (Harlan, J., dissenting). See also *Tague* v. *Louisiana*, 444 U. S. 469, 470–471 (1980); *Michigan* v. *Tucker*, 417 U. S. 433, 444 (1974).[7] It does not

---

[7] JUSTICE STEVENS nonetheless asserts that "[i]n *Miranda* the Court specifically rejected case-by-case inquiry into whether there was a knowing, voluntary, and intelligent waiver of Fifth Amendment rights, opting for a prophylactic rule that eschewed case-by-case inquiry." *Post*, at 661, n. 7. As the very quotation on which JUSTICE STEVENS relies demon-

in any way cast doubt on the legitimacy or necessity of *Edwards* to acknowledge that in some cases a waiver could be knowing, voluntary, and intelligent even though it occurred when the police recommenced questioning after an accused had invoked the right to counsel. The Court had several times refused to adopt *per se* rules governing the waiver of *Miranda* rights. *Michigan* v. *Mosley*, 423 U. S. 96 (1975); *North Carolina* v. *Butler, supra.* See also *Brown* v. *Illinois*, 422 U. S. 590, 603–604 (1975). And, while *Mosley* did distinguish the right to counsel from the right to silence, 423 U. S., at 104, n. 10, much of the logic and language of the opinion could be applied to the invocation of the former. *Edwards* was not a necessary consequence of *Miranda*. Thus it could be justifiably believed that a waiver of the right to counsel following its invocation could be voluntary even if the police initiated the conversation.

The state of the law in the lower courts prior to the *Edwards* decision bears out this reality. Cf. *Michigan* v. *Payne*, 412 U. S., at 56. Before *Edwards*, the question whether the authorities could resume questioning after a defendant has asked for an attorney was acknowledged to be unsettled. See *United States* v. *Hernandez*, 574 F. 2d 1362, 1370, n. 16 (CA5 1978); *United States* v. *Herman*, 544 F. 2d 791, 796, n. 8 (CA5 1977). Some courts prohibited resumption of questioning unless initiated by the suspect. *E. g.*, *United States* v. *Womack*, 542 F. 2d 1047, 1050–1051 (CA9 1976); *United States* v. *Priest*, 409 F. 2d 491, 493 (CA5 1969). On the other hand, a number of courts allowed renewed interrogations after a request for counsel. *E. g.*, *Blasingame* v. *Estelle*, 604 F. 2d 893 (CA5 1979); *White* v. *Finkbeiner*, 611 F. 2d 186, 191 (CA7 1979), vacated and remanded, 451

---

strates, however, *Miranda*'s *per se* rule extended no further than requiring that the now-famous warnings be given in every case, regardless of the individual circumstances. *Miranda* did not adopt a *per se* rule with regard to waiver of the right to counsel. See 384 U. S., at 475–476. That development awaited *Edwards*.

U. S. 1013 (1981); *United States* v. *Rodriguez-Gastelum*, 569 F. 2d 482, 488 (CA9) (en banc), cert. denied, 436 U. S. 919 (1978); *Hill* v. *Whealon*, 490 F. 2d 629 (CA6 1974).   See also *United States* v. *Clark*, 499 F. 2d 802, 807 (CA4 1974).[8]

In *Johnson* v. *New Jersey*, we declined to measure the prospectivity of *Miranda* from the date of *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), because it had not been "fully anticipated" or "clearly foreshadowed" by that decision.   384 U. S., at 734.   "The disagreements among other courts concerning the implications of *Escobedo*, however, have impelled us to lay down additional guidelines for situations not presented by that case.   This we have done in *Miranda* and these guidelines are therefore available only to persons whose trials had not begun" when *Miranda* was decided. 384 U. S., at 734 (footnote omitted).   The same logic argues against retroactive application of *Edwards*, which, in light of the disagreements among lower courts, laid down additional guidelines for the implementation of *Miranda*.

In short, it cannot be said that our decision in *Edwards* had been "clearly" or "distinctly" foreshadowed.   See *Adams* v. *Illinois, supra*, at 283.   Cf. *Brown* v. *Louisiana*, 447 U. S., at 336.   In these circumstances, we consider the reliance

---

[8] As JUSTICE STEVENS points out, a dozen state courts had excluded evidence obtained under similar circumstances.   See *post*, at 663, n. 9.   The rulings of the state courts were not as one-sided as he implies, however. Among cases upholding reinterrogation of a suspect who had asserted his right to counsel are *Ladd* v. *State*, 568 P. 2d 960, 966, n. 8 (Alaska 1977), cert. denied, 435 U. S. 928 (1978); *State* v. *Greenawalt*, 128 Ariz. 150, 158–160, 624 P. 2d 828, 836–838, cert. denied, 454 U. S. 882 (1981); *Brown* v. *United States*, 359 A. 2d 600, 601–602 (D. C. 1976); *State* v. *Stone*, 397 A. 2d 989, 994–995 (Me. 1979); *State* v. *Greene*, 91 N. M. 207, 212–213, 572 P. 2d 935, 940–941 (1977); *Commonwealth* v. *Jefferson*, 445 Pa. 1, 5–6, 281 A. 2d 852, 854–855 (1971); *Sweiberg* v. *State*, 511 S. W. 2d 50 (Tex. Crim. App. 1974) (and cases cited); *Nash* v. *State*, 477 S. W. 2d 557, 560–563 (Tex. Crim. App.), cert. denied, 409 U. S. 887 (1972); *State* v. *Pierce*, 94 Wash. 2d 345, 350–352, 618 P. 2d 62, 65–66 (1980) (remanding for further factfinding).

interest compelling, even though *Edwards* did not overrule a specific decision.

## C

The retroactive application of *Edwards* would have a disruptive effect on the administration of justice. We can only guess at the number of cases where *Edwards* might make a difference in the admissibility of statements made to the police, but the number is surely significant. In all of those, some inquiry would be required to assess the substantiality of any *Edwards* claim. That investigation, and the possible retrial, would be hampered by problems of lost evidence, faulty memory, and missing witnesses. See *Jenkins* v. *Delaware,* 395 U. S. 213, 220–221 (1969).

## D

In sum, *Edwards* has little to do with the truthfinding function of the criminal trial, and the rights it is designed to protect may still be claimed by those whose convictions preceded the decision. It would be unreasonable to expect law enforcement authorities to have conducted themselves in accordance with its bright-line rule prior to its announcement; and retroactive application would disrupt the administration of justice. Weighing these considerations, we conclude that *Edwards* should not be applied retroactively.

## III

At a minimum, nonretroactivity means that a decision is not to be applied in collateral review of final convictions. For purposes of this case, that is all we need decide about *Edwards.*[9] Our prior cases have drawn the nonretroactivity

---

[9] In *Wyrick* v. *Fields,* 459 U. S. 42 (1982) *(per curiam),* a federal habeas action, we reversed the determination of the Court of Appeals that the police conduct in that case violated *Edwards.* We did not consider whether *Edwards* applied in such circumstances, nor did we have to, because even if it did the lower court had erred on the merits. That decision cannot be read as a holding that *Edwards* should be applied retroactively to cases on

line in a variety of places. Some decisions have been applied only to defendants whose convictions were not yet final when the new rule was established, *United States* v. *Johnson,* 457 U. S. 537 (1982); *Linkletter* v. *Walker,* 381 U. S. 618 (1965), some only to those defendants whose trials had not yet begun at that point, *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *DeStefano* v. *Woods,* 392 U. S. 631 (1968), some only to those whose constitutional rights were violated after the law-changing decision was handed down, *United States* v. *Peltier,* 422 U. S. 531 (1975); *Desist* v. *United States,* 394 U. S. 244 (1969); *Stovall* v. *Denno,* 388 U. S. 293 (1967), and some only to those cases where the prosecution sought to introduce (newly) illegal evidence after the date of the nonretroactive decision, *Fuller* v. *Alaska,* 393 U. S. 80 (1968). Just where the line should be drawn as to *Edwards* need not be decided today.

## IV

The Court of Appeals erred by evaluating the constitutionality of the police conduct in this case under the standards set out in *Edwards.* We express no opinion as to whether the conduct of the police in this case was acceptable under prior cases from this Court or the Eighth Circuit, and remand to the Court of Appeals for that determination.

*Reversed and remanded.*

JUSTICE POWELL, concurring in the judgment.

In *Edwards* v. *Arizona,* 451 U. S. 477 (1981), this Court determined that the accused's waiver of his right to counsel

---

collateral review. For the same reasons, of course, *Oregon* v. *Bradshaw,* 462 U. S. 1039 (1983), should not be read as holding that *Edwards* applies on direct review to interrogations occurring before it was decided. The questioning involved there occurred nine months before *Edwards* was decided. On direct appeal, the Oregon Court of Appeals held that, in light of *Edwards,* the statements should have been suppressed. We reversed because the state court had misread *Edwards.* The retroactivity of *Edwards* was not considered.

during custodial interrogation was involuntary because he was subjected to renewed interrogation without counsel present after having invoked that right. It was uncertain at the time whether the Court merely intended to apply *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938), that had held that waivers of counsel are effective only if they are "an intentional relinquishment or abandonment of a known right or privilege," a determination made by reference to "the particular facts and circumstances surrounding [each] case, including the background, experience, and conduct of the accused." See 451 U. S., at 482. Alternatively, *Edwards* could have been interpreted as establishing a new *per se* rule that, once the right to counsel has been invoked, a waiver of that right, however voluntary under the *Zerbst* standard, can never be valid if made in response to further police questioning. See *Edwards, supra,* at 488–490 (POWELL, J., concurring in result). Confusion as to the proper interpretation of *Edwards* persisted in subsequent cases. See, *e. g., Oregon* v. *Bradshaw,* 462 U. S. 1039 (1983); *id.,* at 1047, n. 1 (POWELL, J., concurring in judgment) (citing lower court cases). The Court now states clearly, relying in part on *Bradshaw,* that *Edwards* established a new *per se* rule and to that extent overruled *Johnson* v. *Zerbst, supra.*[1] *Ante,* at 647–648.

This acknowledgment suffices, in my view, to resolve the issue posed by the present case. I previously have urged the Court to adopt Justice Harlan's suggestion that a new rule of constitutional law should be applied only to review

---

[1] In *Edwards,* although concurring in the judgment, I expressed concern as to whether there was an intent to overrule *Zerbst.* See 451 U. S., at 491–492. In *Bradshaw,* last Term, in an opinion also concurring only in the judgment, I reiterated my conviction that the Constitution requires no *per se* rule on an issue as purely factual as whether and when a valid waiver of counsel occurs. 462 U. S., at 1049–1051. As the contrasting opinions of JUSTICES MARSHALL and REHNQUIST in *Bradshaw* illustrate, even the new *per se* rule is more likely to confuse than to clarify. See *id.,* at 1048 (POWELL, J., concurring in judgment). Nevertheless, I now, of course, accept *Edwards* and *Bradshaw* as binding authority.

of criminal convictions not yet final when the rule is announced.[2]  *Hankerson* v. *North Carolina,* 432 U. S. 233, 246–248 (1977) (concurring in judgment).  As Justice Harlan reasoned in *Mackey* v. *United States,* 401 U. S. 667, 675–695 (1971) (concurring in judgments in part and dissenting in part), that approach follows directly from a proper conception of the scope of the writ of habeas corpus, as contrasted to direct review.  A brief review of the reasons for that approach relevant to the present case will explain why I do not join the Court's opinion.

Retroactive application on habeas corpus of constitutional rules governing criminal procedure is unnecessary to advance the purposes of habeas corpus, even under a regime that permits the federal courts on habeas to vacate a final conviction on any properly preserved ground of federal constitutional error.  Review on habeas to determine that the conviction rests upon correct application of the law in effect at the time of the conviction is all that is required to "forc[e] trial and appellate courts . . . to toe the constitutional mark."[3]  *Id.,* at 687.  Nor will fundamental fairness require complete retroactivity, except in rare instances.[4]  Because retroactive

---

[2] The Court adopted this view in *United States* v. *Johnson,* 457 U. S. 537 (1982), to the extent of holding that new rules of Fourth Amendment law would be applied to all convictions not yet final when the rule was announced.

[3] Although it might seem desirable perpetually to revise past convictions in light of evolving legal doctrine, the attempt to do so is fundamentally at odds with the rule of law.  "At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted.  If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all."  *Mackey* v. *United States,* 401 U. S., at 690–691 (opinion of Harlan, J.).  See also *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 262 (1973) (POWELL, J., concurring).

[4] We should give retroactive effect on habeas to decisions announcing rules of criminal procedure required to ensure fundamental fairness, *e. g.,* *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), or holding conduct entirely

application of new rules of constitutional law generally does little to advance the purposes of collateral relief on habeas, it is particularly difficult in such cases to justify imposing upon the State the costs of collateral review. These are not insubstantial. They include "the burden on judicial and prosecutorial resources entailed in retrial" and "the miscarriage of justice that occurs when a guilty offender is set free only because effective retrial is impossible years after the offense." *Hankerson* v. *North Carolina, supra,* at 247. Retroactive application of constitutional rules frustrates the State's enforcement of its criminal law despite the State's careful adherence to the federal constitutional standards that governed at the time of the prisoner's conviction.

The costs imposed upon the State by retroactive application of new rules of constitutional law on habeas corpus thus generally far outweigh the benefits of this application. It is therefore unnecessary to consider the *Linkletter/Stovall* factors, as these were intended merely to guide the Court's balancing of the costs and benefits that accrue from retroactive application of a particular rule.

Certainly the *per se* test adopted in *Edwards* is not a rule necessary to assure fundamental fairness. As the Court's opinion states, "in those situations where renewed interrogation raises significant doubt as to the voluntariness and reliability of the statement and, therefore, the accuracy of the outcome at trial, it is likely that suppression could be achieved without reliance on the prophylactic rule adopted in *Edwards*." *Ante,* at 644.

For these reasons, I concur in the judgment.

---

immune from criminal punishment, *e. g.*, *Roe* v. *Wade*, 410 U. S. 113 (1973). Releasing on habeas prisoners who have been convicted by fundamentally unfair procedures, or who have committed no constitutionally punishable offense at all, would give effect to our decisions in those rare cases where a conviction fully in accord with the law governing at the time of conviction is nonetheless plainly unjust. See *Mackey* v. *United States*, *supra*, at 692–693.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Respondent Stumes is an acknowledged lawbreaker. His confession, together with other evidence of his guilt, brands him as such. Whether his incarceration for the past dozen or more years is adequate or insufficient punishment for his crime is a matter of no concern to this Court. What is—or should be—of concern is the conduct of other lawbreakers.

While respondent was in custody, and after he had requested the assistance of counsel, the police interrogated him on two separate occasions. As the Court held in *Edwards* v. *Arizona*, 451 U. S. 477 (1981), such interrogation is unlawful. There is no dispute in this Court that respondent's constitutional rights were violated.[1] Nevertheless, because the unlawful interrogation took place prior to May 18, 1981, the date *Edwards* was decided, the Court holds that respondent's statements are admissible in evidence even though they would have been inadmissible if they had been made after May 18, 1981. In reaching this result, the Court states that the question is whether *Edwards* "should be applied retroactively," *ante*, at 639, and then answers the question in the negative because *Edwards* established a "new rule." *Ante*, at 647.

The "new rule" that should concern the Court is the one it announces today, rather than the rule that was applied in *Edwards*. For it was well settled long before *Edwards* was decided that police may not interrogate a prisoner after he has asked for the assistance of a lawyer. The case therefore does not present any real "retroactivity" question. It does, however, raise a serious question concerning this Court's use of its power to create new rules of law.

---

[1] This Court limited its grant of certiorari in this case to the question of whether *Edwards* "should be applied retroactively" to this case. *Ante*, at 642. Therefore, the holding of the Court of Appeals that the police conduct in this case violated respondent's rights under the Fifth Amendment is not at issue here, and must be taken as a given.

## I

In 1966 the Court decided to "secure scrupulous observance of the traditional principle, often quoted but rarely heeded to the full degree, that 'the law will not suffer a prisoner to be made the deluded instrument of his own conviction.'" *Johnson* v. *New Jersey*, 384 U. S. 719, 730 (1966). Specifically, in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), the Court decided that an individual must be warned prior to custodial interrogation that he has the right to remain silent, the right to have an attorney present during questioning, and the right to have an attorney appointed to represent him free of charge if he cannot afford one. See *id.*, at 467–473. The Court also noted that once an individual requests the presence of an attorney during questioning, "such [a] request *affirmatively secures* his right to have one" during questioning, *id.*, at 470 (emphasis supplied). "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking *there can be no questioning.*" *Id.*, at 444–445 (emphasis supplied). The Court elaborated:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent ques-*

*tioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.*

"This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time." *Id.*, at 473–474 (emphasis supplied) (footnote omitted).

This language is clear and mandatory. The police "must respect" an individual's request that he be permitted to consult with an attorney prior to custodial interrogation; interrogation "must cease until an attorney is present." Indeed, this language forbids the police even to ask if the individual wishes to waive his rights, since "there can be no questioning." Here respondent made a request to consult with counsel prior to questioning, but the police questioned him anyway, without affording him that opportunity. There is simply nothing in the *Miranda* opinion that gave the police the slightest reason to believe such conduct was permissible.[2]

Even before *Edwards*, this Court had consistently read *Miranda* to impose an absolute obligation on the police to respect an individual's request for counsel. In *Michigan* v.

---

[2] One significant omission from the opinion of the Court is any claim that there is language in *Miranda* that could have led police to believe that they *could* interrogate an individual after he had requested an opportunity to confer with counsel. The omission is understandable; there is no such language.

*Mosley*, 423 U. S. 96 (1975), the Court held that police may question an individual after he invokes his right to remain silent only if his right to cut off questioning is scrupulously honored. However, the Court expressly distinguished the invocation of the right to consult with counsel from the assertion of the right to remain silent, see *id.*, at 101, n. 7, and explained that this distinction came from *Miranda* itself:

> "The dissenting opinion asserts that *Miranda* established a requirement that once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present. But clearly the Court in *Miranda* imposed no such requirement, for it distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.'" 423 U. S., at 104, n. 10 (citations omitted).[3]

Similarly, in *Fare* v. *Michael C.*, 442 U. S. 707 (1979), the Court observed that *Miranda* created a *"per se"* rule that upon a request for counsel, interrogation must cease until counsel is provided. See 442 U. S., at 717–719.[4]

---

[3] In his opinion concurring in the result, JUSTICE WHITE added:

"The question of the proper procedure following expression by an individual of his desire to consult counsel is not presented in this case. It is sufficient to note that the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." 423 U. S., at 110, n. 2.

[4] The Court elaborated:

"The *per se* aspect of *Miranda* was thus based on the unique role the lawyer plays in the adversary system of criminal justice in this coun-

The *Edwards* opinion itself demonstrates the error in the conclusion the Court reaches today. After acknowledging the *per se* aspect of *Miranda*,[5] the Court explained how its holding was derived directly from *Miranda:*

> "*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' 384 U. S., at 474. Our later cases have not abandoned that view. In *Michigan* v. *Mosley*, 423 U. S. 96 (1975), the Court noted that *Miranda* had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel. 423 U. S., at 104, n. 10; see also *id.*, at 109–111 (WHITE, J., concurring). In *Fare* v. *Michael C.*, *supra*, at 719, the Court referred

try. Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts. For this reason, the Court fashioned in *Miranda* the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." 442 U. S., at 719.

[5] "In *Miranda* v. *Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to the presence of an attorney. 384 U. S., at 479. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the interrogation must cease until an attorney is present.' *Id.*, at 474.

"*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. Here, the critical facts as found by the Arizona Supreme Court are that Edwards asserted his right to counsel and his right to remain silent on January 19, but that the police, without furnishing him counsel, returned the next morning to confront him and as a result of the meeting secured incriminating oral admissions." 451 U. S., at 481–482.

to *Miranda*'s 'rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease.' And just last Term, in a case where a suspect in custody had invoked his *Miranda* right to counsel, the Court again referred to the 'undisputed right' under *Miranda* to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' *Rhode Island* v. *Innis*, 446 U. S. 291, 298 (1980). *We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."* 451 U. S., at 485 (emphasis supplied).[6]

Because *Edwards* itself makes it perfectly clear that the rule that was reconfirmed in that case had been part of our law ever since *Miranda* was decided in 1966, I find no merit in the Court's reasoning. The fact that some police departments may have failed to heed the plain language of the *Miranda* opinion certainly is not a justification for reaching

---

[6] If *Edwards* contains any innovation, it is one favorable to the police. While the language of *Miranda* is mandatory, indicating that no interrogation can take place until the individual has conferred with a lawyer, *Edwards* makes it clear that this language does not extend to a conversation between the authorities and the individual initiated by the latter:

"In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth or Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver." 451 U. S., at 485–486.

the conclusion that the reconfirmation of what was said in *Miranda* should be regarded as a new constitutional rule.

## II

The "retroactivity" analysis of today's majority merits separate scrutiny. The majority makes no attempt to define a "new rule" that gives rise to a retroactivity question, but merely assumes that *Edwards* created one. *Ante*, at 642–643. Its reasoning for treating *Edwards* as having created a "new rule" is implicit, however, in its discussion of what it calls the "reliance factor"—the authorities' reliance on the "prior rule." The Court states that the police could not be faulted for failing to anticipate *Edwards*, since prior law could have been understood to permit a case-by-case evaluation of whether a suspect's decision to speak with police despite an earlier invocation of the right to consult with counsel was a knowing, voluntary, and intelligent waiver of that right.[7] The majority concludes that *Edwards* can be con-

---

[7] There is reason to question the majority's reading of "prior" law. The Court cites only three of our cases as supporting a case-by-case approach. The first, *Michigan* v. *Mosley*, 423 U. S. 96 (1975), in fact points in the opposite direction, as the discussion in Part I, *supra*, demonstrates. The second is *Johnson* v. *Zerbst*, 304 U. S. 458 (1938). Of course, *Zerbst* was decided long before *Miranda* and hence places no gloss on it. *Zerbst* was also a case decided under the Sixth Amendment, and the policies underlying the Fifth and Sixth Amendments are quite distinct, as this Court has often pointed out in rejecting reliance on Sixth Amendment precedent in Fifth Amendment contexts and vice versa. See *Estelle* v. *Smith*, 451 U. S. 454, 470, n. 14 (1981); *United States* v. *Henry*, 447 U. S. 264, 272, 273–274, n. 11 (1980); *Rhode Island* v. *Innis*, 446 U. S. 291, 300, n. 4 (1980); *United States* v. *Wade*, 388 U. S. 218, 223–227 (1967). The third, *North Carolina* v. *Butler*, 441 U. S. 369 (1979), did not concern the *per se* aspect of *Miranda*—there the accused had not invoked his right to consult with counsel. Moreover, *Miranda* itself was inconsistent with the case-by-case waiver inquiry of *Zerbst*. In *Miranda*, the Court specifically rejected case-by-case inquiry into whether there was a knowing, voluntary, and intelligent waiver of Fifth Amendment rights, opting for a prophylactic rule that eschewed case-by-case inquiry:

"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the

sidered as announcing a new rule because the law prior to *Edwards* was "unsettled," and cites as evidence the fact that some lower courts had disagreed as to the correct interpretation of *Miranda*. *Ante*, at 648–649.

This approach to defining a "new rule" for retroactivity purposes is completely unprecedented. The majority concedes that *Edwards* was not a "clear break" with the past, *ante*, at 646–647, yet that sort of change in the law has normally been required before a retroactivity question is even raised. For example, in *Desist* v. *United States*, 394 U. S. 244 (1969), the Court wrote: "However clearly our holding in *Katz* [v. *United States*, 389 U. S. 347 (1967),] may have been foreshadowed, it was a clear break with the past, and we are thus compelled to decide whether its application should be limited to the future." *Id.*, at 248.[8] The fact that the position ultimately rejected by this Court had been previously accepted in some but not all lower courts has never been sufficient to demonstrate that a new rule has been created. *United*

---

availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time." 384 U. S., at 468–469 (footnote omitted).

[8] See *Brown* v. *Louisiana*, 447 U. S. 323, 335–336 (1980) (plurality opinion); *Michigan* v. *Payne*, 412 U. S. 47, 55 (1973); *Adams* v. *Illinois*, 405 U. S. 278, 283 (1972); *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106 (1971); *Johnson* v. *New Jersey*, 384 U. S. 719, 731 (1966). In fact, in *Johnson*, on which the Court relies, *ante*, at 649, the Court noted that *Miranda* should not be applied retroactively because it involved police practices that this Court had explicitly declined to condemn in the past. In *Stovall* v. *Denno*, 388 U. S. 293 (1967), the Court rejected retroactive application when police practices that had been unanimously upheld by the lower courts prior to this Court's decision were at issue. *Id.*, at 299–300.

*States* v. *Estate of Donnelly*, 397 U. S. 286, 295 (1970). Until today it had been clear that no retroactivity arises when a decision is based on principles previously announced by this Court, even though there is no precedent squarely on point. *Henderson* v. *Morgan*, 426 U. S. 637, 651–652 (1976) (WHITE, J., concurring). That the principles governing the decision in *Edwards* were well recognized before that case was decided is amply demonstrated by the host of cases that had previously condemned the police practices at issue.[9]

The curious character of the Court's new conception of a "new rule" is well illustrated by *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968). There the question was whether this Court's endorsement of a rule of antitrust law which had previously been followed only by

---

[9] See, *e. g.*, *Thompson* v. *Wainwright*, 601 F. 2d 768 (CA5 1979); *United States* v. *Massey*, 550 F. 2d 300, 307–308 (CA5 1977); *United States* v. *Womack*, 542 F. 2d 1047, 1050–1051 (CA9 1976); *United States* v. *Clark*, 499 F. 2d 802, 807 (CA4 1974); *United States* v. *Crisp*, 435 F. 2d 354, 357 (CA7 1970); *United States* v. *Priest*, 409 F. 2d 491 (CA5 1969); *Moore* v. *State*, 261 Ark. 274, 278, 551 S. W. 2d 185, 187 (1977); *Webb* v. *State*, 258 Ark. 95, 522 S. W. 2d 406 (1975); *Davis* v. *State*, 243 Ark. 157, 419 S. W. 2d 125 (1967); *People* v. *Brake*, 191 Colo. 390, 397–399, 553 P. 2d 763, 770 (1976); *People* v. *Harris*, 191 Colo. 234, 552 P. 2d 10 (1976); *People* v. *Salazar*, 189 Colo. 429, 433–434, 541 P. 2d 676, 680 (1975); *People* v. *Medina*, 71 Ill. 2d 254, 260–261, 375 N. E. 2d 78, 80 (1978); *People* v. *Cook*, 78 Ill. App. 3d 695, 697–698, 397 N. E. 2d 439, 441 (1979); *Stevens* v. *State*, 265 Ind. 396, 404, 354 N. E. 2d 727, 733 (1976); *Pirtle* v. *State*, 263 Ind. 16, 23–25, 323 N. E. 2d 634, 637–639 (1975); *State* v. *Boone*, 220 Kan. 758, 767–768, 556 P. 2d 864, 873 (1976); *State* v. *Crisler*, 285 N. W. 2d 679 (Minn. 1979); *Murphy* v. *State*, 336 So. 2d 213 (Miss. 1976), cert. denied, 429 U. S. 1076 (1977); *State* v. *Nash*, 119 N. H. 728, 407 A. 2d 365 (1979); *Commonwealth* v. *Mercier*, 451 Pa. 211, 302 A. 2d 337 (1973). See also *People* v. *Bowers*, 45 App. Div. 2d 241, 357 N. Y. S. 2d 563 (1974) (police can ask suspect to reconsider decision to consult with counsel but nothing else); *State* v. *Turner*, 32 Ore. App. 61, 573 P. 2d 326 (1978) (police can ask suspect to reconsider decision to consult with counsel but nothing else); *State* v. *Arpan*, 277 N. W. 2d 597 (S. D. 1979) (suspect must be given a reasonable opportunity to consult with counsel); *State* v. *Marcum*, 24 Wash. App. 441, 601 P. 2d 975 (1979) (waiver can only exist where suspect initiates conversation).

the Court of Appeals for the Second Circuit constituted the promulgation of a new rule for retroactivity purposes. The Court held that it did not:

"Like the Court of Appeals, this Court relies for its conclusions upon existing authorities. These cases make it clear that there was no accepted interpretation of the Sherman Act which conditioned a finding of monopolization under §2 of the Sherman Act upon a showing of predatory practices by the monopolist. In neither case was there such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one. Whatever development in antitrust law was brought about was based to a great extent on existing authorities and was an extension of doctrines which had been growing and developing over the years. These cases did not constitute a sharp break in the line of earlier authority or an avulsive change which caused the current of the law thereafter to flow between new banks. We cannot say that prior to those cases potential antitrust defendants would have been justified in thinking that then current antitrust doctrines permitted them to do all acts conducive to the creation or maintenance of a monopoly, so long as they avoided direct exclusion of competitors or other predatory acts." *Id.*, at 497–499 (footnotes omitted).[10]

The same analysis clearly indicates that *Edwards* did not create a new rule under the majority's own description of that case. *Edwards* did not constitute a fundamental shift in the law. As the Court appears to recognize, it was at most a modest extension of existing doctrine. The majority's approach is inconsistent with *Hanover Shoe*.

---

[10] The Court added that there could be no "new rule" when it could not be said that there was a "well-defined interpretation of the Sherman Act which was abruptly overruled . . . or that United's leasing system could not be considered an instrument for the exercise and maintenance of monopoly power." 392 U. S., at 502.

Less than two years ago the Court considered whether our holding in *Payton* v. *New York*, 445 U. S. 573 (1980), that the Fourth Amendment prohibits warrantless arrests of persons in their homes was the announcement of a "new" rule of law. We wrote:

> "*Payton* also did not announce an entirely new and unanticipated principle of law. In general, the Court has not subsequently read a decision to work a 'sharp break in the web of the law,' unless that ruling caused 'such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one.' Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court, or disapproves a practice this Court arguably has sanctioned in prior cases, or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved." *United States* v. *Johnson*, 457 U. S. 537, 551 (1982) (citations omitted).

After noting that the Government had argued that a ruling should not be retroactive if the law had been "unsettled" prior to the ruling, *id.*, at 559, the Court wrote:

> "[T]he Government's [position] would reduce its own 'retroactivity test' to an absurdity. Under this view, the only Fourth Amendment rulings worthy of retroactive application are those in which the arresting officers violated pre-existing guidelines clearly established by prior cases. But as we have seen above, cases involving simple application of clear, pre-existing Fourth Amendment guidelines raise no real problems of retroactivity at all. Literally read, the Government's theory would automatically eliminate *all* Fourth Amendment rulings from consideration for retroactive application." *Id.*, at 560.

Of course, a rule of nonretroactivity in all cases has never been the law, and with good reason. Such a rule would immunize police conduct from scrutiny whenever a question can be said to be debatable; thus the authorities would never have an incentive to comply with even the plainest implications of our cases. It is for this reason that *Johnson* wisely rejected such a rule.[11] Nor does the majority purport to endorse such a rule today. Yet that is the plain import of its holding, since nothing but law that already has been clearly established will ever be applied if, as the majority suggests, cases cannot qualify for "retroactive" application merely because they involve an "unsettled" question, even when this Court has already "strongly indicated," *ante,* at 647 (quoting *Edwards,* 451 U. S., at 484), what the correct answer to the "unsettled" question is.

As *Johnson* points out, the majority's test for "retroactivity" is in reality no test at all. If the law were "settled" prior to *Edwards,* then no real retroactivity question would arise.[12] Respect for the orderly development of the law should require more faithful adherence to a recent precedent such as *Johnson* than is evidenced today, especially inasmuch

---

[11] "If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions, and to adopt a let's-wait-until-it's-decided-approach.'" 457 U. S., at 561 (emphasis in original) (footnote omitted) (quoting *Desist* v. *United States,* 394 U. S. 244, 277 (1969) (Fortas, J., dissenting)).

[12] Of course, in my view this in fact is not a retroactivity case, for precisely this reason. See Part I, *supra.*

as *Johnson*'s expressed purpose was to lend order and predictability to the law of retroactivity.   See 457 U. S., at 542–548.

III

The Court is understandably concerned about the conduct of private lawbreakers.   That concern should not, however, divert its attention from the overriding importance of requiring strict obedience to the law by those officials who are entrusted with its enforcement—and, indeed, with its interpretation.   For decisions of this kind have a corrosive effect in a society dedicated to the rule of law.   There is, after all, profound wisdom in Justice Brandeis' observation:

> "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen.   In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.   Crime is contagious.   If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.   To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution.   Against that pernicious doctrine this Court should resolutely set its face." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (dissenting opinion).

I respectfully dissent.