787 F.2d 589
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CRAIG FOWLER, CHARLES JORDAN, LARRY JOHNSON, Petitioners-Appellants,
v.
A. R. JAGO, E. P. PERINI, Superintendents, Respondents-Appellees.
 84-3591
 United States Court of Appeals, Sixth Circuit.
 3/3/86
 
 AFFIRMED
 N.D.Ohio
 ON APPEAL from the United States District Court for the Northern District of Ohio
 Before: MERRITT and KENNEDY, Circuit Judges; and PHILLIPS*, Senior Circuit Judge.
 KENNEDY, Circuit Judge.
 
 
 1
 In this case arising from a lengthy gun-battle with police, petitioners were convicted by a jury in the Cuyahoga County, Ohio Common Pleas Court of three counts of aggravated burglary, one count of aggravated robbery and two counts of attempted aggravated murder. On an earlier appeal from the denial of their petitions for writ of habeas corpus, a divided panel of this Court remanded the action to the District Court for a hearing on the voluntariness of petitioners' confessions. 683 F.2d 983 (6th Cir. 1982).
 
 
 2
 The District Court conducted a lengthy (two week) evidentiary hearing. It also considered the state court testimony of deceased or unavailable police officers, as well as the balance of the testimony and exhibits at the state trial. Again the District Court denied the writ finding that the confessions were, in fact, voluntary. Its detailed finding of facts and conclusions are set forth in a comprehensive 118 page memorandum.
 
 
 3
 Petitioners assert that the District Court's finding of voluntariness of their confessions is clearly erroneous. In addition, they raise two issues with respect to the conduct of the state trial: (1) whether they were improperly denied the right to a preliminary hearing permitted by Ohio criminal procedure rules, and (2) whether their right to cross-examine and impeach one of the witnesses was impermissibly curtailed. They also claim that the District Court erred in refusing to qualify an expert witness at its evidentiary hearing and that it erred in finding that the evidence in the state court was sufficient to support the verdicts on the attempted aggravated murder charges.
 
 
 4
 Evidence which the state court jury and the District Court credited established the following events. On the evening of May 29, 1974, Andrew 'Schoolboy' Jackson and his son were at a home on Fourth Avenue in East Cleveland, Ohio, owned by one Judy Winegarner. Petitioners, armed with guns, broke into the home. At gunpoint, they robbed Schoolboy of rings and money, and took television and stereo equipment, clothing and guns. During the robbery, Judy Winegarner and Andrew Jackson, Jr., another son, returned to the home from the store. Petitioners tied up everyone except Schoolboy, who was forced to go with them.
 
 
 5
 Petitioners took Schoolboy to his home on Euclid Avenue, also in East Cleveland. Several persons were at the home when petitioners forced their way in. There they also took guns and other items. A person living on the third floor of the house called the East Cleveland police. Becoming aware of the arrival of the police, petitioners left the home taking Schoolboy with them. He broke free. Petitioners fled on foot through backyards until they reached the home of the O'Brien family. There they broke into the home, took the nine members of the O'Brien family hostage, and engaged in a shoot out with the Cleveland police. Five officers were wounded. Two of the O'Briens were wounded by police fire, when they and petitioners left the home.
 
 
 6
 The District Court found that the arrest of petitioners occurred in the manner testified to by the police officers and rejected petitioners' testimony unless corroborated by other evidence. It expressly found petitioners were not credible witnesses. It stated than an important factor in its credibility determination was petitioners' testimony as to the events that evening. Petitioners claimed that they believed Schoolboy was selling dope. As Sunni Muslims, they felt it was their duty to 'forbid evil, first by word of mouth, then by whatever means is necessary to stop whatever evil thing is going on in the community.' (Folwer testimony, state court transcript p. 6597). They had already confronted Schoolboy on the street. Petitioners testified that they went to the Winegarner home to persuade Schoolboy to quit dealing in heroin and to convert him to the Sunni Muslim religion, that Schoolboy willingly flushed a quantity of heroin down the toilet, and that he willingly gave them his guns. This they testified accounted for Schoolboy's guns at the O'Brien home. They claimed not to have taken anything from either home but Fowler was unable to explain how Schoolboy's television got in Fowler's Thunderbird. Nor could they account for the testimony to the contrary of the persons at the Fourth Avenue or Euclid homes. Petitioners also claimed Schoolboy went with them willingly to the Euclid home in order to give them his guns. They also claimed to have fired only twelve harmless shots from the O'Brien home. Yet Fowler, in a recorded conversation he had with a radio-television reporter during the shoot out stated, 'we have returned the fire plenty of times.' He also asked for more ammunition and indicated a desire to continue the battle with the police.
 
 
 7
 The District Court found that force had been required to subdue petitioners at the scene of the arrest in the O'Brien yard. It found that Fowler suffered a black left eye at some time that evening. Jordan, it found, received an injury to the upper lip and the right nostril, probably by being kicked while officers were gaining control of him in the O'Brien backyard. Fowler and Jordan's other complaints about their treatment by police before they got to the police station were discredited. Although the District Court found that there were angry officers at the police station, one of whom grabbed Jordan by the shoulders, it found that officer Kelly, who was in charge of Jordan, grabbed the other officer and pushed him out of the room. Jordan claimed that the cut on his lip occurred at the police station when an officer struck him with a rifle butt. The District Court did not believe this testimony, since Jordan had the cut on his lip in the newspaper pictures taken at the scene of the arrest at the O'Brien home.
 
 
 8
 The District Court did find that while at the station and before giving his statement, Fowler sustained a single slapping blow to the face from officer Bayerl's shotgun, which caused a contusion and black eye. The skin was not broken. It discredited Fowler's testimony about repeated blows by a shotgun because he suffered no facial bleeding, no fractured facial bones, no lacerations, and no extensive bruising. Even Fowler recognized the inherent improbability that he could be struck as he claimed and have so little injury to show for it. The District Court also found that officer Bayerl threatened petitioner.
 
 
 9
 Johnson was found to have been bruised or hit on the face at the time of his arrest. Further he had been threatened with a gun if he moved, and that obscenities with forms of racial slurs were directed to him, also at the time of arrest. The District Court found that Johnson sustained a laceration to the right eyebrow area when he was pushed against a steel door while entering the police station. This occurred when Johnson made a move as if trying to get away and one of the officers shoved Johnson up against the door and held him there.
 
 
 10
 The District Court found that no statements were made by petitioners at the immediate time of any of the above events. Johnson's first statement was made in the police car on the way to the station. When asked why he was shooting at the police, Johnson said he had nothing against the police, that he just wanted to shoot Schoolboy for peddling narcotics in the area. The District Court found that Johnson had received his Miranda rights and that no conduct of the police up to this time coerced his statement. That finding is not clearly erroneous.
 
 
 11
 Fowler's statement was made to Detective Farmer of the Cleveland Police Department. Two other supervisory officers were present. Bayerl who had previously struck him was not present at the time nor was the statement given in the room where the blow had been struck. When Detective Farmer got to the station, Fowler was taken to a second floor room. There he was asked if he had been given his rights and he acknowledged that he had. Fowler stated he wanted to talk to an attorney, Charles Fleming, before he made a written statement. Efforts to reach Fleming by phone were unsuccessful.[1] Farmer testified and the District Court credited his testimony that Fowler said, 'he would gladly talk to us.'
 
 
 12
 He says--I asked him if he was going to make a statement. He says, 'no, not a written statement, but I'll talk to you. You caught me. I'll tell you how I got there.' So he started talking.
 
 
 13
 The District Court found that the interview with Detectives Farmer and Copeland and Sergeant Deyan was free from violence or the threat of violence, and did not put Fowler in fear for his life or of serious bodily harm; that he was not threatened in any way; that he was fully advised of his rights and understood them; and that he received no promises. At the evidentiary hearing Fowler, for the first time, claimed that he was promised that his oral statement would not be 'on the record.' The District Court rejected that testimony. At the state court trial, Fowler had not admitted to giving the oral statement. The District Court further found that officer Bayerl's previous threats and acts did not cause or contribute to Fowler giving this oral statement. The District Court specifically found that the statement was not the product of a weakened mental or physical condition.
 
 
 14
 Fowler testified that he was in a great deal of pain; that his head was buzzing due to the tear gas, and from the beating he received from Bayerl. The District Court discredited this testimony because it has found he received only a single slap with the flat side of the shotgun from Bayerl, not the repeated blows and beating he alleged. The District Court found that the only remaining svmptom from the tear gas was some sweating and that Fowler had refused medical attention. It also considered that Johnson, who received medical treatment for his laceration, did not complain about the tear gas.
 
 
 15
 The District Court found that Fowler wanted to tell the story of why he was there. This had also been his reason for the telephone interviews he had given a radio-television reporter during the shoot out. The District Court also noted as further evidence of his willingness to give a statement, that a few hours later, Fowler initiated an interview and indicated a willingness to give a written statement without his lawyer on the condition that the full story be put into the statement.[2]
 
 
 16
 Jordan denied ever having made an oral statement. Lieutenant Joyce and Detectives Copeland and Staimpel testified at various hearings that they were present when Jordan did make an oral statement. They testified that he was willing to tell them what happened but not to give them a written statement. The District Court credited their testimony that Jordan did give a statement and that it was voluntary. The District Court heard the witnesses and was in a position to judge their credibility. We cannot find its factual findings to be clearly erroneous.
 
 
 17
 In addition to his oral statement in the police car, Johnson also gave a written statement at the police station. At the evidentiary hearing he claimed that the officers made the statement up and forced him to sign the document. He also testified at that hearing that he was allowed to call his attorney before he signed the statement. At the suppression hearing in state court, his testimony was contradictory in a number of other respects. The District Court rejected Johnson's testimony because of these discrepancies, and believed the testimony of the officers. We cannot find that it was clearly erroneous in doing so.
 
 
 18
 Mindful of the Supreme Court's conclusion in Miller v. Fenton, 106 S. Ct. 445, 453 (1985), that the voluntariness of confessions is 'a legal question meriting independent consideration in a federal habeas corpus proceeding,' we have considered 'whether, under the totality of the circumstances, the confession[s] [were] obtained in a manner consistent with the Constitution . . ..' With respect to Jordan and Johnson, the use of force as found by the District Court was no greater than required by the violent circumstances of the arrests or Johnson's attempt to escape.
 
 
 19
 Fowler's situation is more troubling. The reprehensible conduct of officer Bayerl in striking Fowler cannot be excused. Had Fowler confessed to Bayerl at that time or while Bayerl was still present or in charge, we would find the confession inadmissible. The use of force to extract a statement renders it inadmissible as one secured by inquisitorial means. Where, however, the District Court found that the lapse of time and the distinct atmosphere of a different room and the presence of three supervisory officers, all of them unaware of this misconduct, dissipated any compulsion from the prior officer's misconduct, we conclude that the force did not coerce the confession. The District Court, and we as well, may take into account all the circumstances relating to voluntariness including that petitioner actively sought to do battle with police. The tape of Fowler's conversation with the radio-television reporter indicates a desire to participate in continued violence. Someone who seeks confrontations with the police is less likely to be affected by police threats than the average citizen. Moreover it seems apparent, as the District Court found, that Fowler told his story because he wanted to rather than because he was forced. His conversations with the radio-television reporter and his later offer to give a written statement containing his full story support the District Court's findings that Fowler wanted to tell his story. We affirm the holding of the District Court that the confessions were voluntary.
 
 
 20
 Petitioners next complain of the conduct of the state trial. The petitioners assert that they were denied the right to fully cross-examine Schoolboy Jackson at the state trial. Their brief points to no specific questions as to which objections were sustained. Schoolboy's prior record was before the jury. He was questioned about whether he was dealing in drugs. His financial, marital, and family background was explored. The other procedural error urged is that Jordan was not permitted to call witnesses who would have testified as to Schoolboy's alleged dealing in drugs. Whether Schoolboy was or was not dealing in drugs was collateral to the issues in the case. The District Court correctly ruled that there was no constitutional error in the state court rulings.
 
 
 21
 Petitioners argue that they were wrongly induced to waive a preliminary hearing. The Ohio Court of Appeals considered the issue and found it harmless since subsequent to the waiver, petitioners were indicted by a grand jury which negated the necessity of a preliminary hearing. The District Court assumed, for the purpose of its decision, that the waiver was coerced and that petitioners were denied counsel in connection with that waiver, but found the lack of a preliminary hearing harmless beyond a reasonable doubt. We agree with the District Court's analysis of this issue and its conclusions.
 
 
 22
 We also agree with the District Court that the evidence was sufficient to support the guilty verdicts on the attempted aggravated murder charges.
 
 
 23
 Finally, petitioners complain of the District Court's refusal to hear the testimony of a psychologist regarding the generalized likelihood of the reactions of petitioners and the police under the circumstances of the shoot out, the arrest, etc. He had not spoken to or examined any of the petitioners. The District Judge felt the testimony would not be of value since persons react differently to stress and it would not be of assistance in helping him to determine the manner in which petitioners and the police reacted here. The District Court has discretion with respect to the admission of expert testimony. We find no abuse of that discretion here.
 
 
 24
 We find that the District Court did not err in denying the writ of habeas corpus and, accordingly, affirm.[3]
 
 
 
 *
 Honorable Harry Phillips participated in oral argument but due to his death on August 3, 1985, he took no part in the opinion
 
 
 [1]
 Although these facts raise a potential Edwards v. Arizona, 451 U.S. 477 (1981), issue, the Supreme Court has held that Edwards does not apply retroactively to federal collateral attacks upon state convictions. Compare Solem v. Stumes, 465 U.S. 638 (1984) (holding that Edwards does not apply retroactively) with Shea v. Louisiana, 105 S. Ct. 1065 (1985) (holding that Edwards applies to cases pending on direct appeal in a state court at the time the Court decided Edwards)
 
 
 [2]
 That written statement, which was not offered as evidence in the state trial, is consistent with the oral statement that was admitted
 
 
 [3]
 As an additional matter, we feel obligated to criticize the Prosecuting Attorney of Cuyahoga County, Ohio, for the handling of this appeal. At the close of oral argument on June 4, 1985, Judge Merritt requested that the parties file supplemental briefs within ninety days on the question whether a coerced confession can constitute harmless error when overwhelming proof otherwise supports a conviction. Respondents did not file a supplemental brief until September 12, 1985, or ten days after the September 2, 1985 deadline. Furthermore, the brief began: 'It is the respondent's position that the only force used against the petitioners was that exerted during and incidental to arrest.' Supplemental Brief of Respondents-Appellees at 2. This statement ignores the slapping blow to Fowler's face from officer Bayerl's shotgun, which caused a contusion and black eye. Moreover, the supplemental brief, while relying heavily on the facts, did not contain any record citations. The record in this case encompasses twenty-six volumes of state trial court transcript totaling more than 8000 pages and fifteen volumes of District Court proceedings totaling approximately 2200 more pages. This Court simply does not have the judicial resources to do the parties' work for them