**ALDRICH ENTERPRISES, INC., etc., et al., Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

Nos. 88–2575, 89–1038.

United States Court of Appeals, Tenth Circuit.

July 12, 1991.

Rehearing Denied Oct. 4, 1991.

Jerry E. Cardwell, Denver, Colo. (George T. Ashen, Denver, Colo., Henry Pedersen, Jr., Estes Park, Colo., Joseph C. French and David M. Haynes of French & Stone, P.C., Jonathan M. Jellema of Bragg & Dubofsky, P.C., Boulder, Colo., Richard A. Winkel, Denver, Colo., Dale S. Carpenter of Dale S. Carpenter, II, Lakewood, Colo., Joseph P. Genchi of Joseph P. Genchi, P.C., Estes Park, Colo., and Robert B. Miller of Miller, Hale & Harrison, Boulder, Colo., with him on the brief), for plaintiffs-appellants.

Phyllis Jackson Pyles, Asst. Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., Michael J. Norton, U.S. Atty., and Jeffrey Axelrad, Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., with her on the brief), for defendant-appellee.

Before HOLLOWAY, Chief Judge, and SEYMOUR and ANDERSON, Circuit Judges.

HOLLOWAY, Chief Judge.

Certain residents and property owners of the Town of Estes Park, Colorado (the Landowners) commenced this action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, seeking to recover for property damage allegedly resulting from the collapse of Lawn Lake Dam. Two consolidated appeals are presently before us. In No. 88–2575, the Landowners appeal from the district court's entry of summary judgment against them on their first claim for relief, which alleged negligence by the government in relation to the inspection, maintenance, and repair of Lawn Lake Dam. In No. 89–1038, the Landowners appeal from the district court's denial of their 60(b)(2) Fed.R.Civ.P. motion respecting their first claim on the ground of newly discovered evidence. We affirm.

I

A

In July 1982, the Lawn Lake Dam collapsed, releasing great quantities of water, and flooding downstream property in the Town of Estes Park, Colorado.[1] The Lawn Lake Dam and Reservoir were constructed on federal lands in the Rocky Mountain National Park by the Farmers Irrigating Ditch & Reservoir Company (Farmers) under a right-of-way granted by the United States Department of the Interior in 1903. The grant was authorized by the Act of March 3, 1891, 42 U.S.C. §§ 946–49, and was made by an Occupancy Use Permit issued to Farmers.

Following the collapse of Lawn Lake Dam, the Landowners commenced separate actions in federal district court in Colorado against the United States under the FTCA to recover for property damage caused by the flooding. The district court consolidated these actions, and the Landowners filed an amended consolidated complaint in February 1985, which alleged five claims for relief. In the first four claims, the Landowners asserted four distinct theories of tort liability grounded essentially on negligence,[2] and in the last claim they alleged

---

1. We have had occasion to discuss the unfortunate factual circumstances surrounding the collapse of Lawn Lake Dam before. *See Farmers Irrigating Ditch & Reservoir Co. v. Kane,* 845 F.2d 229 (10th Cir.1988) (holding that plaintiff Farmers, an "admitted tortfeasor" did not have recourse to the interpleader procedure). The collapse has spawned litigation in the state courts as well. *See, e.g., Kane v. Town of Estes Park,* 786 P.2d 412 (Colo.1990); *Kane v. Royal Ins. Co. of America,* 768 P.2d 678 (Colo.1989) (en banc).

2. The first claim is discussed in text. In the second claim, the Landowners alleged that an

order of the Secretary of the Interior imposed a duty upon the government to identify privately-owned dams on government property and to inspect them to discover items in need of repair, and the government was negligent in carrying out this duty.

In the third claim, they alleged that the government had sole control over access to Lawn Lake Reservoir and Dam and through its negligence Farmers was prevented from entering the area to carry out necessary repairs and maintenance. Lastly, the Landowners alleged in their fourth claim that the government was negligent in engaging in dynamite blasting operations near the dam; allegedly, the result was a

that the government was liable for trespass. The Landowners sought monetary relief in excess of $25,000,000.

At issue here is the first claim. In that claim, the Landowners alleged that, as the owner of Rocky Mountain National Park, the government owed them a duty to require or perform inspections, maintenance, and repairs of Lawn Lake Dam, and to warn them of any hazards associated with the dam; that the government in fact knew that the dam was leaking and in need of repairs and, further, that the dam was in a dangerous condition due to the storage of unauthorized quantities of water; and, as a proximate result of the government's breach of its duty to the Landowners, the dam weakened to the point of collapse.

### B

The government moved for summary judgment on the first three claims of the amended consolidated complaint. In an unpublished memorandum opinion the district court granted this relief as to the first two claims, and denied it as to the third.

As to the first claim, the district court observed that the issue presented was "whether the plaintiffs made a sufficient showing of the defendant's control of the Lawn Lake Dam to make the government liable as an owner under the [Colorado] statute." Dist.Ct.Op. at 2. The principal statute at issue was Colo.Rev.Stat. § 37–87–104(1) (1973), which made reservoir "owners" liable for all damages caused by flooding due to the collapse of their dams.[3] The court read Colorado authorities as making control (including operation and maintenance) of a reservoir and dam the key element in the statutory "ownership" inquiry. It concluded that the Landowners "h[ad] failed to show that the

weakening of the dam's embankments and its ultimate collapse. *See* I R., Doc. 1, at 7–8.

**3.** The district court also cited Colo.Rev.Stat. § 37–87–104.5 in its discussion of the government's potential negligence liability under Colorado law. This statute provides that, unless the name and address of the "true owner" of a dam has been filed with the state engineer by January 1, 1985, "[t]he person or persons actually in control of the physical structure of any dam

United States government had sufficient control of the dam to make it liable for negligence as an owner under Colorado's statute." Dist.Ct.Op. at 4.

The Landowners moved for reconsideration of the court's summary judgment ruling as to their first claim. They argued that such reconsideration was appropriate in light of *Weiss v. United States*, 787 F.2d 518 (10th Cir.1986), which was decided after the court entered summary judgment. In *Weiss*, we upheld a FTCA claim against the government under Colorado law arising from a helicopter accident on federal lands. Referencing analogous Colorado decisions in the landlord-tenant context, we concluded that the government (as landowner) owed a duty of care with regard to artificial conditions placed on its premises by third parties (*i.e.*, an aerial tramway cable), even though it neither owned nor controlled the instrumentality. 787 F.2d at 520, 525–26.

The district court, however, denied relief. It said that *Weiss* did not "affect the issues under the first claim for relief and [wa]s not an applicable change of law." I R., Doc. 8, at 1. The Landowners and the government subsequently agreed to the dismissal of the remaining claims, bringing the action to a close. The Landowners commenced a timely appeal from the court's summary judgment ruling on their first claim (No. 88–2575).

In preparing their appellate brief as to the first claim, the Landowners discovered a letter written to Farmers by the United States Park Service on August 14, 1975 that imposed certain restrictions on Farmers' activities in the maintenance and repair of Lawn Lake Dam. They believed that the letter could convince the court that there was adequate evidence of the govern-

shall be deemed, for determining liability arising from ownership of a dam and with respect to operation thereof, to be the owners thereof." However, we do not believe that the court gave any controlling effect to this statute (as opposed to, perhaps, giving it some persuasive value). It was not enacted until 1984, after Lawn Lake Dam collapsed, and we find no indication that it was intended to apply retroactively.

ment's exercise of control over Lawn Lake Dam to support a negligence action against it as a statutory "owner." Accordingly, they moved the district court for reconsideration on the ground of newly discovered evidence. *See generally* Fed.R.Civ.P. 60(b)(2).

The motion was denied. The court noted that it "ha[d] no jurisdiction in the matter" because of the pending appeal from its summary judgment ruling (No. 88–2575) and, further, that the letter was "not persuasive." I Supp.R., Doc. 3, at 1. The Landowners filed a timely appeal from the denial of the motion for reconsideration (No. 89–1038), and this appeal was consolidated with the appeal in No. 88–2575 by order of this court.

## II

*No. 88–2575*

Generally, the FTCA constitutes a waiver of sovereign immunity for certain suits against the government arising from the negligence or wrongful conduct of its employees. *See Dalehite v. United States,* 346 U.S. 15, 17, 73 S.Ct. 956, 959, 97 L.Ed. 1427 (1953). For liability purposes, the statute mandates that the government be treated as a private person, and specifies that the governing substantive law is the law of the place where the negligent or wrongful conduct occurred. 28 U.S.C. § 1346(b); *see, e.g., LeMaire By and Through LeMaire v. United States,* 826 F.2d 949, 953–54 (10th Cir.1987) (applying Colorado law). Accordingly, Colorado law governs our liability inquiry here relating to the collapse of Lawn Lake Dam.

■ Guided by the Supreme Court's decision in *Salve Regina College v. Russell,* — U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), we give no deference here to the district court's reading of Colorado law. We hold that the rationale of *Salve Regina,* although adopted in a diversity case, applies in the context of this FTCA suit governed by state law.[4] This rationale should be given retroactive effect. *See Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984).

We review summary judgment rulings *de novo,* applying the same legal standard under Fed.R.Civ.P. 56 as the district court. *See Gonzales v. Millers Cas. Ins. Co.,* 923 F.2d 1417, 1419 (10th Cir.1991). Specifically, we must determine whether there are any genuine issues of material fact and, if not, whether the substantive law was correctly applied. The evidence is viewed in the light most favorable to the nonmovant. *See Baker v. Penn Mut. Life Ins. Co.,* 788 F.2d 650, 653 (10th Cir.1986). Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who "fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986).

## A

According to the government, Colorado statutes addressing the liability of reservoir owners are controlling, in particular, Colo.Rev.Stat. § 37–87–104(1) (1973). This

---

**4.** In the context of diversity litigation, the Court in *Salve Regina* held that appellate courts should review a district judge's determinations of state law *de novo.* 111 S.Ct. at 1221. In doing so, the Court rejected the "local judge" rule which had been applied in this circuit (albeit, somewhat inconsistently). *See, e.g., Gonzales v. Millers Cas. Ins. Co.,* 923 F.2d 1417, 1420 & n. 7 (10th Cir.1991) (citing Goodnight, *Chaos on Appeal: The Tenth Circuit's Local Judge Rule,* 67 Den.U.L.Rev. 515 (1990)).

In essence, *Salve Regina* predicated its holding on four factors: (1) the statutory grant of

plenary appellate authority to courts of appeals under 28 U.S.C. § 1291; (2) the implicit obligation of courts of appeals to conduct an "independent" review of legal issues; (3) the dual goals of "doctrinal coherence and economy of judicial administration"; and (4) the structural compatibility of appellate courts for plenary review of legal issues (*e.g.,* the availability of multi-judge panels). *Id.* 111 S.Ct. at 1221–22. We believe that these four factors transcend the diversity context, and that review here of the district judge's interpretation of Colorado law should also be *de novo* in a suit under the FTCA.

statute provides that "the owner of a reservoir shall be liable for all damages arising from leakage or overflow of the waters therefrom or floods caused by the breaking of the embankments of such reservoir." It codifies the principle of strict or absolute liability as to property damage or personal injuries caused by the collapse of reservoirs—a principle which is rooted in Colorado common law. *See Garnet Ditch & Reservoir Co. v. Sampson*, 48 Colo. 285, 110 P. 79, 80 (1910); *Sylvester v. Jerome*, 19 Colo. 128, 34 P. 760, 762 (1893). *See also Cass Company–Contractors v. Colton*, 130 Colo. 593, 279 P.2d 415, 418 (1955) (en banc) (noting that "Colorado cases have followed the doctrine of absolute liability for certain dangerous enterprises, such as the impounding of waters").[5]

▪ The government contends that it is not liable under § 37–87–104(1) as an "owner" of Lawn Lake Dam. The true "owner," it says, is Farmers, who possessed a right-a-way interest in the land and constructed and maintained Lawn Lake Dam. We must agree. In *Larimer County Ditch Co. v. Zimmerman*, 4 Colo.App. 78, 34 P. 1111 (1893), the Colorado Court of Appeals indicated that a statutory finding of "ownership" need not be predicated on an interest in the reservoir land rising to the level of a fee simple absolute. Specifically, the court held that a lessee of land upon which a reservoir was constructed could be deemed liable as a reservoir "owner," where it was under a duty to construct and maintain the reservoir and was in "absolute control and possession" of the land. 34 P. at 1112–13.

▪ There is no allegation here that the government (as opposed to Farmers) ever built or maintained Lawn Lake Dam. Further, pursuant to the statutory grant of a right-of-way to Farmers, the government had no right to possess the reservoir as long as it was used for irrigation purposes, and it is undisputed that it was continuously used for such purposes. *See Kern River Co. v. United States*, 257 U.S. 147, 154–55, 42 S.Ct. 60, 62–63, 66 L.Ed. 175 (1921).[6] Accordingly, like the district court, *see* Dist.Ct.Op. at 3–4, we believe that the Landowners have not demonstrated that the government exercised sufficient control over Lawn Lake Dam to raise a triable issue of a fact as to its liability under § 37–87–104(1) as an "owner."[7]

5. The doctrine of strict or absolute liability as to reservoir failures, however, was abolished by the Colorado legislature in 1986 when it repealed and reenacted § 37–87–104(1). *See Kane v. Town of Estes Park*, 786 P.2d 412, 414 n. 3 (Colo.1990); Salmon, *1986 Colorado Tort Reform Legislation*, 15 Colo.Law. 1363, 1374 (1986). As presently drafted, this statute provides that an "entity or person who owns, controls, or operates a water storage reservoir" cannot be held liable for personal injuries or property damage arising from the failure of the reservoir "unless such failure or partial failure has been proximately caused by the negligence of that entity or person."

6. In *Kern River*, the Court stated: "The right of way intended by the act [of March 3, 1891] was neither a mere easement nor a fee simple absolute, but a limited fee on an implied condition of reverter in the event the grantee ceased to use or retain the land for the purpose indicated in the act." 257 U.S. at 152, 42 S.Ct. at 62. The *Kern River* interpretation of the 1891 Act has been questioned, however, in view of the Court's subsequent interpretation of very similar language to confer easements, not fee estates, in a statute authorizing the issuance of rights-of-way to railroads. *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 277, 279, 62 S.Ct. 529, 536,

86 L.Ed. 836 (1942) (construing the Act of March 3, 1875); *see E.E. Eggebrecht, Inc. v. Waters*, 217 Mont. 291, 704 P.2d 422, 425 (1985) (noting that, after *Great Northern*, the *Kern River* view "rests on a shakey [sic] legal foundation"). Moreover, citing *Great Northern*, the Colorado Supreme Court has recently construed the 1891 Act as granting only easements to recipients of rights-of-way. *Bijou Irr. District v. Empire Club*, 804 P.2d 175, 182 (Colo.1991), *cert. denied*, — U.S. —, 111 S.Ct. 2017, 114 L.Ed.2d 104 (1991).

We do not feel bound by the Colorado Supreme Court's construction of the 1891 Act in *Bijou*. However, under our view of this case at least, this debate over the nature of the property interest conferred under the Act is not dispositive. *See E.E. Eggebrecht*, 704 P.2d at 425 (noting that "there is no useful distinction to be made between a limited fee and an easement when describing the nature of a reservoir right of way granted under the 1891 Act").

7. We note that the government has not argued that § 37–87–104(1) is inapplicable in this FTCA action because it embodies the principle of strict or absolute liability, although such an argument would not be lacking in force. Generally, the government cannot be held liable

The Landowners contend that the district court did not give proper consideration to the limited nature of the right-of-way granted to Farmers under the 1891 Act, and the correspondingly significant interests retained by the government in Lawn Lake Reservoir and dam, in concluding that the government was not an owner under § 37–87–104(1). They note that under the 1891 Act, Farmers was only given the right to "construct, maintain, and repair the Lawn Lake Dam and Reservoir for the storage of waters authorized for irrigation purposes." Appellant's Brief, at 6. The government, on the other hand, retained the right to invite the public onto the premises of Lawn Lake Reservoir and dam to engage in various recreational activities like boating and fishing, and it exercised this right, in part, by publishing and distributing brochures and other advertisements. *See* I R., Doc. 2, Exs. F–H & P. Moreover, the Landowners point out that the government retained the right to limit access to the Reservoir and dam by all persons, including Farmers, to preserve environmental values or to protect the interest of other users of the Rocky Mountain National Park. *See* Appellant's Brief at 7. According to the Landowners, the government's rights and conduct with respect to Lawn Lake Reservoir and dam constitute "indicia of ownership," which were not properly considered by the district court in its ruling under § 37–87–104(1). *Id.* at 7.

We disagree. In the *Larimer County Ditch Co.* opinion the court observed that the evident intention of the General Assembly in enacting § 37–87–104(1) was to compel construction of reservoirs and dams upon scientific principles, and to reduce the danger from such structures to a minimum. 34 P. at 1112.

The statutory term "owner" should be read in this context. It is undisputed that Farmers, not the government, was charged with the construction and maintenance of Lawn Lake Reservoir and dam. These activities go to the heart of the General Assembly's concerns, and thus Farmers (even absent a fee simple absolute interest in the reservoir land) is properly viewed as an "owner" in determining liability under the state law. We do not believe that the same can be said for the rights and conduct of the government with respect to Lawn Lake Reservoir and dam.

**B**

The Landowners also argue that common law negligence principles provide a basis for relief. They acknowledge that there are no Colorado decisions directly on point. However, citing *Weiss,* they rely on decisions in the landlord-tenant context.

We agree that § 37–87–104(1) is not the exclusive ground for relief with respect to damages arising from reservoir failures, and that the Landowners may properly look to common law negligence principles for redress. *See, e.g., Kane v. Town of Estes Park,* 786 P.2d 412, 414–17 (Colo. 1990) (ruling on strict or absolute liability claim under § 37–87–104(1), and negligence claim under common law). *Cf. Parada v. United States,* 420 F.2d 493, 494–95 (5th Cir.1970) (upholding negligence claim under Texas law in the context of a canal failure).

We believe that the landlord-tenant analogy is a good one. Like a lessor, the government conferred on Farmers (the "lessee") an interest in the land underlying the reservoir through a grant of a right-of-way, and retained a reversionary interest.[8]

---

under the FTCA on a state-law theory of strict or absolute liability simply because of its operation of, or involvement with, an ultrahazardous activity, such as the impounding of waters. *See Laird v. Nelms,* 406 U.S. 797, 799, 802–03, 92 S.Ct. 1899, 1900, 1902–03, 32 L.Ed.2d 499 (1972) (citing *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)); *McKay v. United States,* 703 F.2d 464, 472 (10th Cir.1983); *United States v. Ure,* 225 F.2d 709, 711 (9th Cir.1955). Because the government did not make this argument before the district court, we

do not reach it here. We assume, without deciding, that § 37–87–104(1) is applicable to this action.

**8.** The government contends that the landlord-tenant analogy is inappropriate because incident to its right-of-way Farmers received a limited fee, not a leasehold interest. However, both a limited fee and a leasehold estate are interests in land, *see, e.g.,* R. Cunningham, W. Stoebuck & Whitman, *The Law of Property,* § 6.1 (1984), and in each case the grantor retains some inter-

Moreover, in the landlord-tenant context, Colorado tort law provides a framework for analyzing liability that is particularly relevant to these facts where the government ("lessor") did not construct or own the reservoir, was not ordinarily charged with its maintenance, and the alleged harm was inflicted on persons off the land.

Colorado decisions have noted that "[u]nder certain circumstances, a lessor may be held liable for physical harm which resulted from a dangerous condition on his land even though he retains no control over it." *Salazar v. Webb,* 44 Colo.App. 429, 618 P.2d 706, 707 (1980); *see Gonzales By and Through Gonzales v. Bierman,* 773 P.2d 629, 630 (Colo.Ct.App.1989). *Accord Weiss,* 787 F.2d at 526 (noting that in Colorado "the ownership or control of artificial conditions on land" is not determinative of the existence of a legal duty on the part of a lessor). Moreover, in *Moore v. Standard Paint & Glass Co.,* 145 Colo. 151, 358 P.2d 33, 36 (1960) (en banc), the Colorado Supreme Court held that a lessor was "under an affirmative duty not to permit its land to remain in an altered state if such altered state created a condition the natural and foreseeable result of which would result in injury to the adjoining property, and the breach of this duty constitutes actionable negligence."

■ In general terms, Colorado decisions have endorsed the test of § 379A of the Restatement (Second) of Torts where the condition on the leased premises causes injury to persons or property off the premises. *See Bierman,* 773 P.2d at 630; *Salazar,* 618 P.2d at 707. *Cf. Rian v. Imperial Mun. Serv. Group, Inc.,* 768 P.2d 1260, 1263 (Colo.Ct.App.1988) (distinguishing § 379A as only applying to injuries off the leased land).[9] As relevant here, this section provides that after the lessor transfers possession it is subject to liability for physical harm to persons outside the land caused by activities of a lessee on the land if (a) the lessor knew at the time of the lease that the activity would be carried on, and (b) the lessor knew or had reason to know that it would "unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken." Restatement (Second) of Torts § 379A (1965) [hereinafter *Restatement 2d*].[10]

■ Guided by the landlord-tenant analogy, and more specifically § 379A, we conclude that summary judgment was appropriately entered in favor of the government. At the time that it granted Farmers a right-of-way ("lease"), the government undoubtedly knew that Farmers would construct a reservoir and dam. Indeed, under the terms of the statute, Farmers was required to do so or risk forfeiture of its right-of-way. *See Kern River,* 257 U.S. at 154–55, 42 S.Ct. at 62–63. We believe, however, that there is insufficient evidence

est in the property. Accordingly, even if the property interest at issue is characterized as a limited fee, the relationship between the government and Farmers created by the grant of the right-of-way may be reasonably likened to that of a landlord and tenant for the purpose of considering the claims asserted in this case.

9. While we find the general reference to landlord-tenant law in our *Weiss* decision instructive, we note that *Rian* casts doubt on our reliance there on § 379A. In *Weiss,* the helicopter accident and resulting injury occurred on federal land (*i.e.,* the "leased premises"). *See Weiss,* 787 F.2d at 520.

10. In full, the provision reads:
A lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if,

(a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and

(b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.

Restatement (Second) of Torts § 379A (1965). The Restatement describes the circumstances under which a given risk is unreasonable as follows:

Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or the particular manner in which it is done.

*Id.* § 291.

to raise a triable issue of fact as to whether the government knew or should have known that the reservoir would unavoidably involve an unreasonable risk of flooding, or that Farmers would not take special precautions necessary to protect against this harm. And, because this evidentiary failing relates to an essential element of the Landowners' case, summary judgment was appropriate. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ An activity "unavoidably" involves an unreasonable risk if a "necessary consequence" of carrying out the activity is the creation of an unreasonable risk. *Restatement 2d, supra,* § 379A comment c. It is therefore not enough for the Landowners to present evidence showing that the government knew, as a theoretical matter, that dams occasionally fail. They must present evidence showing that the government was aware of facts that would have led a reasonable person to know that a necessary consequence of the operation of Lawn Lake Dam was an unreasonable risk of flooding. *See Kane,* 786 P.2d at 416 & n. 6; *Restatement 2d, supra,* §§ 379A comment c, 837(1) comment i & Illustration 3.

Even if an unreasonable risk of flooding was not a necessary consequence of the operation of Lawn Lake Dam, the government may still be found liable for negligence under the principles of the Restatement. To establish such a claim, the Landowners must demonstrate that there is evidence that the government knew or had reason to know that Farmers would not take necessary precautions in operating the dam. *See id.,* § 379A comment c.

Before us are internal government correspondence spanning the years 1957–59 which the Landowners say indicates that the government through the Park Service was aware that the Lawn Lake Dam was larger than contemplated by Farmers' right-of-way permit, and was in a deteriorated condition.[11] Specifically, the correspondence indicates that in 1909 or 1910, after the construction period provided for in its permit, Farmers raised the height of the dam such that the amount of land covered by water exceeded the amount provided for in the permit by at least 4.4 acres. However, we find no suggestion in this correspondence, or the other evidence in the record, that as a consequence of this enlargement the dam unavoidably posed an unreasonable risk of flooding. Indeed, there is little suggestion in the record that this enlargement had any appreciable impact on the risk of flooding such that a reasonable landowner would have been on notice of a heightened possibility of this harm.[12]

As for the allegedly deteriorated condition of the dam, the correspondence indicates that in 1957 Farmers conveyed the impression to the government that it was "reluctant to undertake the expense of making some necessary repairs for its [Lawn Lake Dam's] proper maintenance." I R., Doc. 2, Ex. J, at 1. And, in 1958, former employees of Farmers told officials of the Park Service that the dam was not capable of impounding the desired amount of water due to erosion and repairs would be necessary to correct the situation. *Id.* Ex. M, at 2. At the time the government apparently viewed the repairs with disfavor

---

**11.** Although the district court reviewed this correspondence and found that it did not allow the Landowners to survive summary judgment as to their first claim, it observed that the correspondence did demonstrate that the government was "aware that the dam was deteriorating and needed repair." Dist.Ct.Op. at 4. Assuming that this reading of the correspondence is correct, under our approach here the central question that must be addressed is: to what time period does this knowledge relate—in particular, was it sufficiently contemporaneous with the collapse of the Lawn Lake Dam to give rise to a triable inference that the government knew or should have known that the reservoir would unavoid-

ably involve an unreasonable risk of flooding, or that Farmers would not take special precautions necessary to protect against this harm. We address this question below and conclude the government's knowledge of the alleged deterioration of Lawn Lake Dam is too distant in temporal terms to provide a ground for relief.

**12.** We note that government officials, who were presumably familiar with the basics of dam construction, appeared to be predominantly concerned with the alleged trespassing effect of the dam enlargement, not safety issues. *See* I R., Doc. 2, Exs. T–V.

because of the allegedly deleterious effect the work would have on the natural beauty of the area. *Id.* Ex. M, at 2 & Ex. N, at 1–2.

We believe that the evidence is insufficient to raise a triable inference that *in 1982* the government knew or had reason to know that the operation of the dam unavoidably involved an unreasonable risk of flooding, or that Farmers was not taking necessary precautions in the operation of the dam. The Landowners present no evidence that Farmers' alleged reluctance to expend resources to repair the dam continued beyond the 1950s. Further, they present no evidence showing that the allegedly necessary repairs were not made by Farmers at some point after 1958, or that the failure to make the repairs increased in any respect the possibility of flooding.

We conclude, therefore, that the Landowners have failed to generate a triable issue of fact under Colorado law and, more specifically, under the standard of § 379A as to the knowledge of the government ("lessor") of a risk of flooding from Lawn Lake Dam. On this claim also we uphold the district court's summary judgment ruling.

### No. 89–1038

The Landowners contend that the district court erred in denying their motion for reconsideration under Fed.R.Civ.P. 60(b)(2). The motion was based on their discovery of a letter written to Farmers by the Park Service on August 14, 1975 that imposed certain restrictions on Farmers' activities in connection with the maintenance and repair of Lawn Lake Dam.[13] The Landowners challenge the court's conclusion that it was without jurisdiction to rule on the merits of the motion because of the pendency of the appeal in No. 88–2575. They argue that they were entitled to relief under the standard of Rule 60(b)(2). In particular, the Landowners contend that the district court erred in failing to recognize that the letter was of material significance in establishing that the government exercised sufficient control over the Lawn Lake Reservoir and Dam to be held liable as an "owner" under Colorado statutes.

■ We review the district court's denial of the Rule 60(b)(2) motion under an abuse of discretion standard. *See Chief Freight Lines Co. v. Local Union No. 886,* 514 F.2d 572, 576–77 (10th Cir.1975). We find no abuse of discretion here. We do agree with the Landowners that the district court misconstrued the scope of its jurisdiction. Although it lacked jurisdiction to *grant* the Rule 60(b)(2) motion due to the appeal in No. 88–2575, the court was free to consider the motion, and the court could then either deny it on the merits, or the court could have notified us of its intention to grant the motion upon proper remand. *Garcia v. Regents of Univ. of California,* 737 F.2d 889, 890 (10th Cir.1984); *see Summers v. State of Utah,* 927 F.2d 1165, 1168–69 (10th Cir.1991) (citing *Browder v. Director, Ill. Dept. of Corrections,* 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978)).

■ In addition to his statement as to lack of jurisdiction, the district judge also stated that the letter relied on by the Landowners "is not persuasive." A motion under Rule 60(b)(2) must, among other things, present matter that is material and of such importance that it would likely alter the outcome—that is, it must have been capable here of creating a genuine issue of material fact. *See Caribou Four Corners, Inc. v. Truck Ins. Exchange,* 443 F.2d 796, 799 (10th Cir.1971). *Accord Harrison v. Byrd,* 765 F.2d 501, 503 (5th Cir.1985). In

---

**13.** The August 14 letter was addressed to an official of Farmers and discussed complaints received by the Park Service from visitors and employees following Farmers' visit to perform annual maintenance work. The Park Service indicated in the letter that in the future, *inter alia,* Farmers would have to: visit the dam and leave in the same day, in the case of small maintenance jobs of two or three hours' duration; prevent any horses it brings on maintenance jobs from grazing; carry out out extended maintenance tasks requiring layovers only when campsites are available under the Park Service schedule. Further, in the letter, the Park Service indicated that it had included copies of some of its regulations. *See* I Supp.R., Doc. 2, Ex. A, at 1–2.

effect, in finding that the August 14, 1975, letter was unpersuasive, the district court concluded that the Landowners could not satisfy the requirements for relief under Rule 60(b)(2). We feel that this conclusion by the district judge was not in error.

### III

Accordingly, the summary judgment on appeal in No. 88–2575 and the order on appeal in No. 89–1038 are

AFFIRMED.