UNITED STATES of America, Plaintiff,

v.

Albert LUMBA, Defendant.

No. 93–1221M.

United States District Court,
D. Colorado.

June 4, 1993.

Daniel Whitney, Sp. Asst. U.S. Atty., for plaintiff.

Suzanne Reposa, for defendant.

## MEMORANDUM OPINION AND ORDER

BORCHERS, United States Magistrate Judge.

THIS MATTER came before the Court on May 28, 1993 for hearing on Defendant's motions to suppress. Present were the following: Daniel Whitney, Special Assistant United States Attorney; Suzanne Reposa, counsel for Defendant; and Defendant. The Court heard the testimony of witnesses and argument of counsel. The motions were then taken under advisement.

### I.

On January 28, 1993, the Security Police Headquarters at Lowry Air Force Base (LAFB) received a telephone call at approximately 5:00 p.m. The caller indicated that he had smelled an odor of marijuana while working in Building 349. He requested that the Security Police investigate.

Master Sergeant Kenneth Janicke was dispatched to Building 349. This building is the Headquarters for LAFB and contains numerous offices. It is a large building with at least three floors. Upon arrival at Building 349, MSgt Janicke smelled nothing. He observed nothing out of the ordinary.

During the course of his investigation in the building, MSgt Janicke came upon Defendant Albert Lumba and Lonnie Cleveland. Both were janitors who were cleaning on the third floor of Building 349. Mr. Cleveland is African–American, and Defendant is Filipino. There were virtually no other individuals in the building at the time MSgt Janicke arrived at approximately 5:30 p.m., as the normal duty day for offices in the building ended at 4:30 p.m.

MSgt Janicke requested additional help from his headquarters. Sergeant John Cross arrived to assist in the investigation.[1] Later Senior Airman Robert Moss arrived with a narcotics dog. All three Security Policemen smelled nothing in the building. They observed nothing out of the ordinary.

SAMN Moss was directed to check out the second floor men's bathrooms with the dog. Nothing was found. In the meantime, MSgt Janicke had contacted Defendant and Mr. Cleveland. He advised both to "stand by" in the area. When asked on cross-examination, MSgt Janicke indicated that neither Cleveland nor Defendant appeared to be under the influence of any narcotics.

The evidence reflects that MSgt Janicke had directed a "common area search" of the building. That encompassed, at least, the second and third floors. The narcotics dog was taken through these floors, even though no smell or other indicia of marijuana existed.

After a period of time, which the Court finds to be in excess of thirty minutes, MSgt Janicke had SAMN Moss bring the dog to the area in front of the base Legal Office on the third floor. A coat was outside of the office. The narcotics dog appeared to have some interest in the coat, but did not formally alert to it. MSgt Janicke then asked Cleveland whose coat it was, and Cleveland advised that it was his. Another coat was found inside the legal office. MSgt Janicke directed Cleveland to come into that office and asked him if he owned the second coat. Cleveland then advised that the coat was not his, but that it belonged to Defendant.

After determining that the coat belonged to Defendant, MSgt Janicke directed SAMN Moss to have the dog sniff the coat. The dog then alerted to the coat by sitting down by it. Defendant was then directed to come into the Legal Office. Defendant was asked if the coat belonged to him. He replied in the affirmative.

There is a dispute as to what transpired next. MSgt Janicke indicated that he requested permission to search the coat. He testified that Defendant reached into the pocket and pulled out what appeared to be a small bag of marijuana. Defendant was then formally arrested. Sgt Cross testified that Defendant reached into the pocket before being requested to give consent for the search. Defendant maintained that he was directed to pull out what was in the pocket.

Sgt Cross testified that he advised Defendant of his rights through use of a card that he carried at the time. He testified that Defendant indicated that he wanted a lawyer. Defendant was then taken to the security police headquarters. Since narcotics were involved, the investigation was turned over to Agent Leslie R. Williams, an investigator with the Office of Special Investigations (OSI). Agent Williams testified that he advised Defendant of his rights again and then obtained a confession. He testified that Defendant indicated to him that he could not put the words together, since he spoke English as a second language. Therefore, Agent Williams put together the witness statement that has been admitted as Government Exhibit 1. Agent Williams indicated that he then had Defendant read the statement and initial it. He claimed that Defendant had no problem understanding him or vice-versa.

Defendant testified that he is a native of the Philippines. He indicated that his native language is a dialect of Tagalog. His testimony was to the effect that he really did not understand what was going on and felt he had a duty to comply with police orders.[2] He testified that he did not understand what Agent Williams said to him and could not read the statement. He further indicated that he provided the statement only to be released from police custody.

## II.

Defendant has filed two motions to suppress. His Motion to Suppress Confession will be discussed first.

---

1. Sergeant Cross has since retired from the United States Air Force.

2. Defendant, as well as other defense witnesses, spent time detailing the brutal police practices that occurred during the Marcos years in the Philippines. This information, though interesting, has no bearing on the outcome of the motions.

The evidence presented at the hearing is clear. Sgt Cross advised Defendant of his rights. Defendant advised Sgt Cross that he wanted a lawyer. Instead of securing a lawyer for Defendant, Sgt Cross transported Defendant to the security police headquarters where he turned him over to Agent Williams. It is unclear whether Sgt Cross advised Agent Williams that Defendant had requested a lawyer. In any event, Agent Williams readvised Defendant of his rights and then obtained the confession at issue.

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that an accused who is in custody and who has

> expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–485, 101 S.Ct. at 1885. This ruling was affirmed and strengthened in *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). The Court held that *Edwards* had established a "bright-line rule" to safeguard pre-existing rights." *Id.* at 646, 104 S.Ct. at 1343.

The direction of the United States Supreme Court has not changed since *Edwards* and *Solem* were decided. In *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Court held that postarraignment confessions are invalid if obtained by the police after a request for counsel is made by a defendant at an arraignment, where the contact with the police was not initiated by the defendant. *Id.* at p. 636, 106 S.Ct. at p. 1411. *See also McNeil v. Wisconsin,* — U.S. —, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

The evidence in this case indicates that Defendant exercised his right to seek the advice of an attorney. He so advised Sgt Cross. No attempt was made to secure an attorney for Defendant. Rather, Defendant was turned over to Agent Williams for further interrogation, which succeeded in obtaining a waiver of counsel and a confession. There is no evidence that contact with Agent Williams was initiated by Defendant. On the contrary, it was Sgt Cross who took Defendant to Agent Williams. The "bright-line rule" established by *Edwards* and *Solem* was crossed by the security policemen in this case. Defendant's motion to suppress his confession is granted.

### III.

Defendant has moved to suppress the evidence seized from his coat. He has argued that he did not consent to any search of his coat. The prosecution has argued that the consent was validly given by Defendant and, even if the consent was not knowingly given, there was probable cause after the narcotics dog alerted.

The report of marijuana was made to the Security Police. The prosecution concedes in its response to the motion to suppress that the smell had been in "one of the men's bathrooms on the second floor of Building 349." (Government Response at p. 1). Defendant and Lonnie Cleveland were found working on the third floor of Building 349 as janitors.

The evidence is clear that, when the security policemen arrived at Building 349, there was no smell of marijuana in any bathroom, hall, or office. There was nothing that appeared out of the ordinary. Virtually all regular military and civilian employees had left for the day. The persons found in the building were those working late or engaged in duties such as janitorial work.

The evidence indicates further that MSgt Janicke made contact with Defendant and Lonnie Cleveland on the third floor. MSgt Janicke directed both to "stand by" and then directed Sgt Cross to fill out field information cards. The Court finds that both Lonnie Cleveland and Defendant were not free to leave the area at that time and had been ordered to remain. The reason for directing the completion of field information cards at that time is unclear. Further, it escapes the Court as to why cards were filled out on these individuals when there was absolutely

no indication of wrongdoing at that time.[3]

The evidence convinces this Court that the narcotics dog was directed to do a sweep of the building. The belongings of both Lonnie Cleveland and Defendant were to be sniffed by the dog purely on suspicion. Both individuals were detained and not free to leave, pursuant to the order of MSgt Janicke. The dog was brought to the third floor to examine them.

■ There may be initially a question about seizure of the coat by the security policemen. The Fourth Amendment comes into play when "there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Merely picking up property and looking at it does not, in the normal situation, constitute a seizure. *See Arizona v. Hicks*, 480 U.S. 321, 324, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1986).

In this case, the seizure of the coat came at the same time as the detention of Defendant. In ordering Defendant and Lonnie Cleveland to "stand by", MSgt Janicke detained both them and their belongings. However one chooses to describe what occurred, there is no question that MSgt Janicke wanted both individuals to remain until he completed the investigation and examined them. The property then was detained.

■ The recent case law in this Circuit on luggage searches provides some guidance. In *United States v. Hall*, 978 F.2d 616 (10th Cir.1992), the Tenth Circuit dealt with the issue of whether a tip alone would allow seizure of a suitcase from an Amtrak train. In that case, the court held that there was insufficient basis for detaining a suitcase in order to allow it to be checked by a narcotics dog. This decision is but a continuation of the line of previous decisions that there must be an articulable and reasonable suspicion before luggage may be detained. *See, United States v. Bloom*, 975 F.2d 1447 (10th Cir.1992); *United States v. Ward*, 961 F.2d 1526 (10th Cir.1992). Reasonable suspicion

to detain property may exist from the totality of circumstances. *See United States v. Bell*, 892 F.2d 959 (10th Cir.1989), *cert. den.* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990).

■ Though this case does not involve a traveller with a suitcase, the general guidance from those cases is useful. Further, the standard for temporary detention of luggage is that it may be detained if there is a reasonable and articulable suspicion that the luggage contains narcotics. *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). A temporary detention is just that—temporary.

■ In this case, the security policemen found nothing out of the ordinary on the second floor of Building 349. There was no smell of marijuana anywhere in the building. MSgt Janicke happened upon Defendant and Lonnie Cleveland. Nothing that occurred in conversations provided any suspicion whatsoever that there were narcotics in the area. The narcotics dog found nothing in the men's bathrooms. The dog was then used for a general warrantless search. No basis is set forth by the prosecution to justify such action on the part of the security police. Broad, warrantless searches are improper, even if used under the pretext of governmental regulation. *See United States v. Johnson*, 994 F.2d 740 (10th Cir.1993).

There was no basis for detaining Defendant. There was no basis for bringing the narcotics dog to the third floor to inspect the coats of Defendant and Lonnie Cleveland. There was no suspicion whatsoever that Defendant had engaged in any wrongdoing.

Further, the prosecution argues that the search of the coat had to be done for the safety of the officers. It is argued that Defendant could have destroyed additional evidence or had a weapon, and that his coat was "immediately accessible." (Government Response, p. 2). The testimony presented indicated that Defendant was not near his coat when the dog was taken to it. When the dog alerted, MSgt Janicke then brought

---

**3.** There was no evidence that field information cards were secured from other janitors on other floors, including the second floor. One could speculate as to other reasons for the cards being secured, with many of those speculations leading to troublesome conclusions.

Defendant over to the coat and has him if it was his. The "immediate accessibility" occurred only due to the actions of the security police.

Finally, the evidence leads to the conclusion that bringing Defendant over to the coat was a pretext to attempt to secure a consent to search. Once the consent was given, it was Defendant who purportedly brought out the first bag. Then the coat was examined by the security police who were present. If the narcotics dog alerted, then the security police should have secured a warrant for examination of the coat. *See United States v. McCranie*, 703 F.2d 1213 (10th Cir.1983).

For the reasons set forth, Defendant's motion to suppress the evidence seized must be granted. In this case, there was no reasonable suspicion that Defendant was involved in any wrongdoing on the third floor of Building 349. His detention and that of his coat were improper.

IT IS HEREBY ORDERED that Defendant's motion to suppress confession is granted; and

IT IS HEREBY ORDERED that Defendant's motion to suppress evidence seized from him is granted.